Argued and submitted November 8, 1999, decision of Court of Appeals and judgment of circuit court reversed and case remanded to circuit court for further proceedings May 10, 2001

## Terry L. SMOTHERS,
*Petitioner on Review,*

*v.*

## GRESHAM TRANSFER, INC.,
an Oregon corporation,
*Respondent on Review.*

(CC 9505-02969; CA A90805; SC S44512)

23 P3d 333

Michael A. Gilbertson, Ransom & Gilbertson, Portland, argued the cause and filed the briefs for petitioner on review.

Thomas W. Sondag, Lane Powell Spears Lubersky LLP, Portland, argued the cause and filed the brief for respondent on review.

Chess Trethewy, Garrett, Hemann, Robertson, Paulus, Jennings & Comstock, P.C., Salem, filed a brief on behalf of *amicus curiae* Associated Oregon Industries. With him on the brief was Paul J. Weddle.

Lawrence Baron, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association. With him on the brief was Daniel L. Keppler.

Kathryn H. Clarke, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association. With her on the brief were Maureen Leonard and Matthew Whitman.

David L. Runner, Salem, filed a brief on behalf of *amicus curiae* SAIF Corporation and Timber Products Company.

G. Kenneth Shiroishi, Dunn Carney Allen Higgins & Tongue, Portland, filed a brief on behalf of *amicus curiae* Oregon Association of Defense Counsel.

Before Carson, Chief Justice, and Gillette, Durham, Kulongoski, Leeson, and Riggs Justices.**

LEESON, J.

---

** Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case. De Muniz, J., did not participate in the consideration or decision of this case.

## LEESON, J.

■    Plaintiff filed this negligence action against defendant, his employer, after an administrative law judge (ALJ) of the Workers' Compensation Board upheld the insurer's denial of plaintiff's workers' compensation claim. The ALJ found that plaintiff's exposure to sulfuric, hydrochloric, and hydrofluoric acid mist and fumes at work was not the "major contributing cause" of plaintiff's respiratory condition and other ailments and, therefore, that plaintiff had not suffered a "compensable injury" under the workers' compensation statutes. Nonetheless, plaintiff believed that he had suffered an injury at work. Accordingly, he brought this action against his employer for negligence. The trial court dismissed plaintiff's complaint for failure to state a claim, ORCP 21 A(8), reasoning that ORS 656.018 (1995) makes workers' compensation law the "exclusive remedy" for work-related injuries, whether or not a claim is compensable. The Court of Appeals affirmed. *Smothers v. Gresham Transfer, Inc.*, 149 Or App 49, 941 P2d 1065 (1997). This court allowed review to address plaintiff's contention that he has been denied a remedy for the injuries that he suffered at work, in violation of the remedy clause in Article I, section 10, of the Oregon Constitution. For the reasons that follow, we hold that, if a workers' compensation claim alleging an injury to a right that is protected by the remedy clause is denied for failure to prove that the work-related incident giving rise to the claim was the major contributing cause of the injury or condition for which the worker seeks compensation, then the exclusive remedy provisions of ORS 656.018 (1995) are unconstitutional under the remedy clause. Applying that holding to the facts of this case, we reverse the decision of the Court of Appeals and the judgment of the trial court and remand the case to the trial court for further proceedings.

## I.   BACKGROUND

### A.   *Facts*

Plaintiff's job as a lube technician for defendant's trucking company required him to work in a pit more than four feet deep in a mechanics' shop where trucks were serviced. A truck-washing area was located outside the shop.

Defendant's employees cleaned the exteriors of trucks by spraying them with a chemical mixture of diluted sulfuric acid and small amounts of hydrochloric and hydrofluoric acids. When the doors to the shop were open, acid mist and fumes from the truck-washing area drifted into the shop and down into the pit where plaintiff worked. For many months, plaintiff experienced headaches, as well as itching, burning, and watering eyes.

In January 1993, plaintiff contracted an upper respiratory infection that developed into pneumonia. He was hospitalized for five days, and he was unable to work for a month. Plaintiff returned to work, but he suffered another episode of pneumonia in February 1993. In November 1993, his physician diagnosed him with bronchitis. In December 1993, plaintiff's coworkers found him so ill that he was lying on the lunchroom floor. He was sent home, where he was bedridden with bacterial bronchitis for most of the holiday season.

Plaintiff returned to work in January 1994, but his physician expressed concern about his slow rate of recovery. Plaintiff called in sick several times between March and mid-June 1994. In June 1994, claimant stopped working for defendant because of his illness.

Thereafter, plaintiff filed a workers' compensation claim for his lung condition. Defendant's insurer denied plaintiff's claim. At a hearing before an ALJ, the issue was whether plaintiff had a compensable occupational disease. See ORS 656.802(1)(a) (defining "occupational disease"). After the hearing, the ALJ upheld the insurer's denial, because plaintiff had failed to prove that his work exposure was the major contributing cause of his lung disorder. See ORS 656.802(2)(a) ("The worker must prove that employment conditions were the major contributing cause of the disease.").[1]

---

[1] Thereafter, the Workers' Compensation Board affirmed the ALJ's opinion and order, and the Court of Appeals affirmed without opinion. Smothers v. Gresham Transfer, Inc., 145 Or App 482, 928 P2d 366 (1996).

## B.   *Legal Context for Plaintiff's Negligence Action*

In *Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 525, 888 P2d 544 (1995), this court held that the exclusive remedy provisions in ORS 656.018 (1993) did not preclude workers whose workers' compensation claims had been denied from bringing civil actions against their employers in an effort to recover damages for their work-related injuries. In this case, after the ALJ had upheld the denial of plaintiff's workers' compensation claim, plaintiff, relying on *Errand*, filed this action against defendant. His complaint alleged that defendant's negligence in subjecting him to the acid mist and fumes at work had caused permanent injury to his lungs; skin blisters, pain and swelling in the joints of his hands, elbows and knees; degeneration of his toenails, fingernails, and teeth; and other physical ailments.

Meanwhile, in response to this court's decision in *Errand*, the 1995 Legislature amended ORS 656.018 and added subsection (6) to provide that workers' compensation is the exclusive remedy for work-related injuries, even if a claim is not compensable. Or Laws 1995, ch 332, § 5. As amended, ORS 656.018 (1995) provides, in part:

"(1)(a)   *The liability of every employer* who satisfies the duty required by ORS 656.017(1) *is exclusive and in place of all other liability* arising out of injuries, diseases, symptom complexes or similar conditions arising out of and in the course of employment that are sustained by subject workers * * *.

"(2)   *The rights given to a subject worker* and the beneficiaries of the subject worker under this chapter for injuries, diseases, symptom complexes or similar conditions arising out of and in the course of employment *are in lieu of any remedies they might otherwise have for such injuries, diseases, symptom complexes or similar conditions against the worker's employer* under ORS 654.305 to 654.335 or other laws, common law or statute, except to the extent the worker is expressly given the right under this chapter to bring suit against the employer of the worker for an injury, disease, symptom complex or similar condition.

"* * * * *

"(6)   *The exclusive remedy provisions* and limitation on liability provisions of this chapter *apply to all injuries and to diseases, symptom complexes or similar conditions of subject workers arising out of and in the course of employment whether or not they are determined to be compensable under this chapter.*"

(Emphasis added.)[2] Those amendments took effect on June 7, 1995, after plaintiff had filed his complaint, and they apply to "all claims or causes of action existing or arising on or after the effective date of this Act, regardless of the date of injury or the date a claim is presented[.]" Or Laws 1995, ch 332, § 66(1). Relying on the "exclusive remedy" provisions of ORS 656.018 (1995), defendant moved to dismiss plaintiff's complaint for failure to state a claim. The trial court granted that motion.

On appeal to the Court of Appeals, plaintiff argued that, although he could not prove that the acid fumes and mist that he had inhaled at work were the *major* contributing cause of his lung condition and other ailments, he nonetheless had been injured at work. Before the 1995 amendments to ORS 656.018, he noted, workers' compensation was the exclusive remedy for only *compensable* work-related injuries. The 1995 amendments to ORS 656.018 made workers' compensation the exclusive remedy for *all* work-related injuries, whether or not a claim is compensable. Those amendments, plaintiff argued, left him with no remedy for the injuries that he had suffered at work, in violation of the remedy clause of Article I, section 10, which guarantees every person a remedy by due course of law for injury to person, property, or reputation. The Court of Appeals rejected plaintiff's argument. *Smothers*, 149 Or App at 54.

---

[2] The 1995 Legislature also amended the policy statement in ORS 656.012 to provide that the Workers' Compensation Act was intended

> "[t]o provide the *sole and exclusive* source and means by which subject workers, their beneficiaries and anyone otherwise entitled to receive benefits on account of injuries or diseases arising out of and in the course of employment shall seek and qualify for remedies for such conditions."

Or Laws 1995, ch 332, § 4 (emphasis added).

In 1997, the legislature renumbered ORS 656.018(6) as ORS 656.018(7). Or Laws 1997, ch 491, § 1.

## C.   *Parties' Arguments*

Before this court, plaintiff repeats his contention that, under the mandate of the remedy clause of Article I, section 10, the legislature may not deprive a person of a remedy for an injury to person, property, or reputation that was recognized at common law, unless the legislature makes available an equivalent remedy. Defendant's response to plaintiff's constitutional argument is twofold. First, defendant contends that the legislature has plenary authority to define what constitutes a cognizable injury to person, property, or reputation. Second, defendant contends that the remedy clause does not limit the legislature's power to modify any common-law or statutory remedy.

In making their arguments, the parties and *amici curiae* assert that this court's remedy clause jurisprudence has not been consistent. This court has acknowledged as much. *See Neher v. Chartier*, 319 Or 417, 423, 879 P2d 156 (1994) (court's case law "has failed definitively to establish and consistently to apply any one theory regarding the protections afforded by" remedy clause); *Hale v. Port of Portland*, 308 Or 508, 529, 783 P2d 506 (1989) ("This court has written many individually tenable but inconsistent opinions about the remedy clause.") (Linde, J., concurring). Scholars likewise have observed that courts have not adopted a consistent remedy clause jurisprudence. *See, e.g.*, David Schuman, *The Right to a Remedy*, 65 Temp L Rev 1197, 1203 (1992) (courts have adopted a "daunting variety of remedy guarantee interpretations"); Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or L Rev 1279, 1282 (1995) (courts in "total disarray" over how to interpret remedy clauses).

As our subsequent discussion will show, the parties are correct that this court has not developed a consistent body of law interpreting the remedy clause of Article I, section 10. Moreover, despite its extensive remedy clause case law, this court previously has not analyzed that clause under the methodology prescribed in *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), for interpreting an original provision of the Oregon Constitution. The purpose of that inquiry is "to understand the wording in the light of the way that

wording would have been understood and used by those who created the provision," *Vannatta v. Keisling*, 324 Or 514, 530, 931 P2d 770 (1997), and to "apply faithfully the principles embodied in the Oregon Constitution to modern circumstances as those circumstances arise," *State v. Rogers*, 330 Or 282, 297, 4 P3d 1261 (2000). Our analysis consists of an examination of the wording of the particular constitutional provision, the historical circumstances that led to its creation, and case law surrounding it. *Priest*, 314 Or at 415-16. We turn to an application of that methodology.[3]

## II.   REMEDY CLAUSE

### A.   *Text*

Article I of the Oregon Constitution is Oregon's Bill of Rights. Section 10 provides:

> "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Section 10 consists of one sentence that is made up of two independent clauses. Both clauses are phrased in mandatory terms. This court has held that the command "shall" in Article I, section 10, is a statement prescribing how government must conduct its functions. *Oregonian Publishing Co. v. O'Leary*, 303 Or 297, 301-02, 736 P2d 173 (1987).

The first clause of Article I, section 10, provides that "[n]o court shall be secret" and that justice "shall be administered, openly and without purchase, completely and without delay * * *." That clause prescribes how justice must be administered in Oregon by identifying both a prohibition (no court shall be secret) and a directive (justice must be administered openly, completely, and without purchase or delay).

---

[3] In *Neher v. Chartier*, 319 Or 417, 428 n 10, 879 P2d 156 (1994), which involved an interpretation of Article I, section 10, the court noted the methodology prescribed in *Priest*, 314 Or at 415-16, but stated that the parties had "not brought to the court's attention any historical circumstances that shed light on the meaning of Article I, section 10, of the Oregon Constitution, and the court is aware of none." Advocates since that time have provided some insight into the historical circumstances.

The second clause mandates that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." As applicable to modern circumstances, the phrase "every man" means every person. Unlike many provisions in bills of rights, which protect individual rights by prohibiting the legislature from enacting certain laws or prohibiting the government from taking certain actions, the second clause of section 10 protects rights respecting person, property, and reputation by mandating affirmatively that remedy by due course of law be available in the event of injury to those rights.

The key terms in the remedy clause are "remedy," "due course of law," and "injury." We examine the meaning of those terms.

The parties agree that the word "remedy" refers at least to a means for seeking redress for injury. Plaintiff describes a "remedy" as an "avenue to receive compensation for a loss," while defendant describes it as the "machinery of the law" that a party sets in motion to recover for a harm. Plaintiff contends that the word "remedy" also includes the redress for an injury, such as money damages, that a litigant obtains through a remedial process.

The Oregon Constitution, including Article I, section 10, was drafted in 1857 and adopted 1859. A mid-nineteenth century law dictionary defined "remedy" as "[t]he means employed to enforce a right or redress an injury." John Bouvier, *A Law Dictionary Adapted to the Constitution and Laws of the United States of America*, 340 (1839). A standard dictionary of the era defined "remedy" as:

> "1. That which cures a disease * * *. 2. That which counteracts an evil of any kind * * *. 3. That which cures uneasiness * * *. 4. That which repairs loss or disaster."

Noah Webster, *An American Dictionary of the English Language*, 934 (1851). Those definitions indicate that the word "remedy" refers both to a process through which a person may seek redress for injury and to what is required to restore a person who has been injured.

We turn to the phrase, "due course of law," which modifies the word "remedy" in Article I, section 10. Plaintiff

contends that, when the drafters wrote the Oregon Constitution in 1857, "due course of law" referred to a common-law cause of action for an injury. Although plaintiff concedes that the legislature constitutionally may enact remedies that are substitutes for common-law remedies, he contends that the requirement in Article I, section 10, that remedy be by "due course of law" means that substitute remedies must be equivalent to common-law remedies. Defendant responds that "due course of law" means any remedial statute that provides a rational means for obtaining a principled decision under the controlling statutory framework. We explain later in this opinion how courts had interpreted the phrase "due course of law" in the years leading up to the drafting of the Oregon Constitution. At this stage of the inquiry, it suffices to note that the drafters of the Oregon Constitution did not explain what they meant by that phrase.

We turn to the word "injury." Plaintiff argues that, when the drafters wrote the Oregon Constitution in 1857, "injury" meant any wrong or damage done by or to another. Legal and standard dictionaries of the time support plaintiff's argument. A legal dictionary defined injury as "a wrong or tort." Bouvier, *A Law Dictionary* at 507. That dictionary further classified injuries as "public" or "private," and "absolute" or "relative." *Id.* Among "absolute" injuries were those affecting person, property, reputation, and liberty. *Id.* "Relative" injuries, by contrast, were, for example, those affecting the rights of husbands in relationship to their wives and parents in relationship to their children. *Id.* A standard dictionary defined "injury," in part, as

"any wrong or damage done to a man's person, rights, reputation, or goods. That which impairs the soundness of the body or health, or which gives pain, is an injury."

Webster, *American Dictionary* at 606.

Defendant responds that the word "injury" in the remedy clause refers to a *legal* injury and that the legislature has plenary authority to determine whether an injury is legally cognizable. Defendant concedes that a legislative determination that a recognized injury no longer is legally cognizable effectively abolishes a previously recognized right, but contends that the only restriction that the remedy clause

imposes on the legislature in that respect is that it cannot abolish a remedy and at the same time recognize the existence of the right. In other words, defendant contends, the drafters of the Oregon Constitution intended to permit the legislature to define what constitutes an injury respecting person, property, or reputation for which a remedy must be available by due course of law.

In summary: Although the text of the remedy clause states in mandatory terms that remedy by due course of law must be available for injury to person, property, or reputation, the clause does not define the terms "remedy," "due course of law," or "injury." Contemporaneous dictionaries provide some definitions, but no definitive picture of the scope or effect of the remedy clause emerges. For further insight into the drafters' intent in writing the remedy clause, we turn to an examination of the historical circumstances relating to that provision. *See Priest*, 314 Or at 416 (describing inquiry into historical circumstances as part of constitutional interpretation methodology).

B. *Historical Circumstances*

1. *Edward Coke's Second Institute*

The principle that the law makes available a remedy for injury to person, property, or reputation comes from the common law. The phrasing of remedy clauses that now appear in the Bill of Rights of the Oregon Constitution and 38 other states[4] traces to Edward Coke's commentary, first published in 1642, on the second sentence of Chapter 29 of the Magna Carta of 1225.

The two sentences comprising Chapter 29 of the Magna Carta of 1225 had appeared as separate chapters, 39 and 40, in the original Magna Carta of 1215.[5] *See* A. E. Dick

---

[4] A list of the states whose bills of rights contain remedy clauses appears in David Schuman, *The Right to a Remedy*, 65 Temp L Rev, 1197, 1201 n 25 (1992).

[5] The only text of the Magna Carta that was available to Coke was the 1225 version. Faith Thompson, *Magna Carta: Its Role in the Making of the English Constitution, 1300-1629*, 5 (1948). However, Coke was aware that King John originally had issued the Magna Carta in 1215, *see* Coke, *Second Institute, A Proeme* at 4 (so stating). King John had done so in response to a list of grievances from his barons. Among other things, the barons contended that John, like his immediate predecessors, was using unscrupulous methods for raising money to support

Howard, *Magna Carta: Text and Commentary*, 33-52 (1964) (reprinting complete text of Magna Carta 1215). A 1797 edition of Coke's *Second Institute* translated Chapter 29 of the Magna Carta of 1225 from the original Latin as follows:

> "No freeman shall be taken, or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers, or by the law of the land. We will sell to no man, we will not deny or defer to any man either justice or right."

Edward Coke, *The Second Part of the Institutes of the Laws of England*, 45 (1797). Coke's commentary on the Magna Carta viewed Chapter 29 as a "roote," out of which "many fruitfull branches of the law of England have sprung." *Id.* at 45. Coke identified nine such branches, and then he explained how each branch had been interpreted by Prliament, by English legal writers, and by precedent. *Id.* at 46. In other words, Coke's commentary was not concerned with the meaning of Chapter 29 of the Magna Carta of 1225. Rather, Coke sought to explain how the common law had evolved *since* 1225 and to assert what Coke thought the law *ought* to be. Faith Thompson, *Magna Carta: Its Role in the Making of the English Constitution, 1300-1629*, 354-56 (1948). Coke used the Magna Carta of 1225, as he had used other ancient texts and reports, as a means to demonstrate how, in his view, the common law protected individuals by placing substantive restraints on both the Crown and Parliament, and by adjusting relations between private individuals. *See* Theodore F. T. Plucknett, *Bonham's Case and Judicial Review*, 40 Harv L Rev 30, 30-31 (1926-27) (discussing Coke's use of history to interpret English law).

---

foreign wars that the barons did not support. Goldwin Smith, *Constitutional and Legal History of England*, 131 (1955). For example, the King had reorganized the royal courts, directing revenues from the sale of writs to the Crown, thereby undermining the baronial courts. A. E. Dick Howard, *Magna Carta: Text and Commentary*, 4 (1964).

The Magna Carta of 1215 was law for about only nine weeks, because King John persuaded the Pope to annul it. Theodore F. T. Plucknett, *A Concise History of the Common Law*, 23 (5th ed 1956). The document was reissued in 1216, 1217, and 1225, each time with many revisions. Smith, *Legal History of England* at 136. The reissue of the Magna Carta in 1225 by King Henry III marked the final form of the document. William McKechnie, *Magna Carta*, 183 (1905).

The dominant theme in Coke's commentary on the first sentence of Chapter 29 was his explanation that the law protected individuals' rights by prohibiting *official* acts depriving freemen of life, liberty, or property unless done according to "the law of the land" or by judgment of peers. Proceedings "by the law of the land" meant "by the common law, statute law, or custome of England," "by the due course, and process of law," or "by due process of the common law." Coke, *Second Institute* at 45-46, 50. With respect to deprivations by public officials, Coke contended that due process of law required indictment or presentment of good and lawful men by original writ of the common law, the opportunity to answer by due process of the common law, and presentment before justices "or thing of record." *Id.* at 50. Coke described at length the evolution and seventeenth-century meaning of the due process guarantees that had grown out of the first sentence of Chapter 29. *Id.* at 49-56; *see also* Charles Grove Haines, *The Revival of Natural Law Concepts*, 1006-07 (1930) (to Coke, due process conveyed principle that making and enforcement of laws must not be arbitrary or contrary to principles of natural or common law); Edward Corwin, *The "Higher Law" Background of American Constitutional Law*, 42 Harv L Rev 365, 393 (1929) (describing Coke's effort to establish common-law procedure as permanent restraint on power); Charles Grove Haines, *The American Doctrine of Judicial Supremacy*, 25-34 (1914) (describing Coke's conception of fundamental law binding both Crown and Parliament).

Coke declared that the second sentence of Chapter 29 had evolved into a different kind of guarantee in English law, *viz.*, one involving the rights of subjects in their *private relations* with one another. The assurance that the king would not sell, deny, or defer justice or right had come to mean that

"* * * *every subject of this realme, for injury done to him in bonis, terris, vel persona, by any other subject,* be he ecclesiastical, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, *may take his remedy by the course of the law, and have justice, and right for the injury done to him,*

*freely without sale, fully without any deniall, and speedily without delay."*

Coke, *Second Institute* at 55. In other words, Coke asserted that the common law of England had come to guarantee every subject a legal remedy for injury to goods, lands, or person caused by any other subject. The purpose of the remedial branch of the common law was to discover "that which is tort, crooked, or wrong" and restore "right" or "justice." *Id.* at 56. Coke viewed the remedial branch of the law as the best birthright that English subjects had, because it protected their goods, lands, person, life, honor, and estimation from injury and wrong. *Id.* Coke praised the common law, because it guaranteed both justice ("justitiam") and the means to attain it ("rectum"). *Id.*

Coke's commentary on Chapter 29 of the Magna Carta of 1225 thus explained that the common law had evolved to protect individuals in two broad respects. The first was a shield against arbitrary government actions involving a person's life, liberty, or property. The second was a guarantee to every subject that a legal remedy was available for injury to goods, land, or person by any other subject of the realm. As noted, Coke viewed the remedial side of the law as "the best birthright the subject hath." *Id.* at 56.

Coke's *Second Institute* made its way to the American colonies through a variety of sources. Several lawyers had *The Institutes* in their libraries. A. E. Dick Howard, *The Road From Runnymede*, 122-24 (1968). In 1687, William Penn published *The Excellent Priviledge of Liberty & Property Being the Birth-Right of Free-Born Subjects of England,* the first commentary on the Magna Carta of 1225 to be published in the American colonies. Penn had copied his commentary verbatim from Henry Care's *English Liberties,* another commentary on the Magna Carta of 1225 that enjoyed immense popularity in England and in the colonies.[6] Howard, *Road From Runnymede* at 124. Care had paraphrased Coke when writing his commentary on the Magna Carta. *Id.* at 89-90. To Care, like Coke, the provisions of the

---

[6] The first American edition of *English Liberties* appeared in the colonies in 1721.

Magna Carta of 1225 were not concessions that had been exacted from kings. Rather, the Magna Carta of 1225 affirmed the common law, which the English had claimed as their birthright. Henry Care, *English Liberties*, 6 (American ed 1721).

Care's commentary on the second sentence of Chapter 29 stated:

> *"We will sell to no Man, deny to no man, etc.* This is spoken in the Person of the King, who in Judgment of the Law, in all his Courts of Justice, is present. <u>And therefore every</u> <u>Subject of this Realm, for Injury done to him, in Person,</u> <u>Lands or Goods, by any other Subject, Ecclesiastical or</u> <u>Temporal, whatever he be, may take his Remedy by the</u> <u>Course of the Law, and have Justice and Right for the</u> <u>Injury done him, freely, without Sale; fully, without denial;</u> <u>and speedily without delay</u>; for Justice must have three Qualities, it must be *Libera*, free; for nothing is more odious than Justice set to sale; *Plena*, full, for justice ought not to limp, or be granted by piece-meal; And *Cleris*, speedy: *Quia Dilatio est quedam negatio*, Delay is a kind of denial: and when all these meet, it is both Justice and Right."

Care, *English Liberties* at 25-26 (italics in original; underscoring added).

### 2. *William Blackstone's Commentaries*

Blackstone's *Commentaries on the Laws of England*, the first volume of which was published in 1765, is another important source for understanding what the drafters of state constitutions intended when they included in declarations or bills of rights the guarantee of remedy by due course of law for injury to person, property, reputation and, in some instances, liberty. Blackstone's *Commentaries* updated Coke's accounts of the evolution of the common law. The *Commentaries* sold quickly in the American colonies and became one of the principal means of the colonists' information about the state of English law in general. Plucknett, *Concise History* at 287.

Blackstone explained that the common law viewed Englishmen as having both absolute and relative rights. 1 William Blackstone, *Commentaries on the Laws of England* *123. Absolute rights are founded on immutable laws of

nature and reason, and usually are called liberties. *Id.* at *123-24. Absolute rights exist in both a state of nature and in civil society, while relative rights, such as those that are based on the marital relationship, are rights that are defined solely by membership in civil society. *Id.* at *123. The principal aim of society is to protect individuals in their enjoyment of absolute rights. *Id.* at *124. The common law recognized three absolute rights: "the right of personal security [including reputation], the right of personal liberty, and the right of private property." *Id.* at *129.

Blackstone described an act that deprives a person of a right as a "wrong." 3 Blackstone, *Commentaries* *116. Wrongs can be public (crimes and misdemeanors) or private (civil injuries). *Id.* Blackstone explained that the remedial part of the law provides a method for recovering for deprivations of rights or for redressing wrongs, be they public or private. 1 Blackstone, *Commentaries* *54. Whenever the common law recognized a right or prohibited an injury, he wrote, it also gave a remedy by legal action initiated by filing the appropriate writ. 3 Blackstone, *Commentaries* *123.

Blackstone echoed Coke in stating that it would be "in vain" for the law to recognize rights, if it were not for the remedial part of the law that provides the methods for restoring those rights when they wrongfully are withheld or invaded. 1 Blackstone, *Commentaries* *56. To Blackstone, the guarantee of legal remedy for injury "is what we mean properly, when we speak of the protection of the law." *Id.* Hence, the maxim of English law, *Ubi jus, ibi remedium*: "for every right, there must be a remedy." James DeWitt Andrews, *American Law: A Commentary on the Jurisprudence, Constitution and laws of the United States*, 590 (2d ed 1908).

### 3. *English Rights in the American Colonies*

As early as 1606, royal charters granted colonists the rights of Englishmen.[7] The charters also gave the colonies

---

[7] For example, the first Virginia charter that King James I issued in 1606, part of which Coke had drafted on the King's behalf, guaranteed to the colonists all "Liberties, Franchises, and Immunities * * * as if they had been abiding and born, within this our Realm of *England*, or any other of our said Dominions." 1 Bernard Schwartz, *The Bill of Rights: A Documentary History*, 60 (1971) (setting out

the authority to legislate for themselves, so long as the laws that they enacted conformed to the English legal system. H. D. Hazeltine, *The Influence of Magna Carta on American Constitutional Development*, 17 Colum L Rev 1, 8 (1917). Because the colonists viewed themselves as English citizens, the common law of England, particularly as it had been summarized by writers like Coke, Care, Penn, and Blackstone, had a profound impact on the colonists' understandings of their rights and the authority of their legislatures, also known at the time as general courts. *See* Howard, *Road from Runnymede* at 119-25 (describing popularity of those writers in colonies); Julius Goebel, Jr., *Constitutional History and Law*, 38 Colum L Rev 555, 565 (1938) (describing colonists' faith in common-law rights).

In the eighteenth century, under the influence of writers like John Locke, James Harrington, and Algernon Sidney, colonists began to describe their ancient common-law rights as "natural rights." 1 F.N. Thorpe, *Constitutional History of the American People, 1776-1850*, 38 (1898); Kermit L. Hall, *The Magic Mirror: Law in American History*, 57-58 (1989). It became increasingly popular to refer to rights as "inalienable" and "God given" even though, historically, the rights could be traced to the Magna Carta or could be identified as basic to the common law. Goebel, *Constitutional History*, 38 Colum L Rev at 565. Couching debates about rights in natural law terms obscured the extent to which the colonists were relying on the common law in resisting parliamentary impositions. Hall, *The Magic Mirror* at 57-58. Despite the rhetoric of natural law, however, colonial leaders like John Adams understood that the common law was the source of "the unalienable, indefeasible rights of men, the honor and

---

Virginia Charter) (emphasis in original). The governors of proprietary colonies had made similar guarantees as part of their effort to recruit colonists. *See id.* at 68 (inhabitants of Maryland "[s]hall have and enjoy all such rights immunities priviledges and free customs within this Province as any naturall born subject of England hath or ought to have or enjoy in the realm of England by force or vertue of the common law or Statute Law of England").

The declarations in the royal charters that the colonists had the rights of Englishmen were a powerful factor in the spread of English constitutional principles and rights in the colonies. H. D. Hazeltine, *The Influence of Magna Carta on American Constitutional Development,* 17 Colum L Rev 1, 8 (1917).

dignity of human nature, the grandeur and glory of the public, and the universal happiness of individuals * * *." Corwin, *The "Higher Law" Background of American Constitutional Law*, 42 Harv L Rev at 169 (quoting John Adams, *Life and Works*, 440 (1851)); *see also* Hazeltine, *The Influence of Magna Carta* at 9 (common law also more important in Puritan colonies than even Puritans at time suspected). As the Revolution neared, colonial lawyers looked to the common law, as it then had evolved, as the source of their right to oppose parliamentary measures such as the "Coercive Acts" of 1774. William Clarence Webster, *Comparative Study of the State Constitutions of the American Revolution*, in 9 *Annals of the American Academy of Political and Social Science*, 381 (R. P. Falker ed 1899).

History also had taught the American colonists that, notwithstanding the Magna Carta and the legal writings about common-law rights that had followed, their rights were not safe from the arbitrary exercise of government power unless they were embodied in positive law. Hazeltine, *The Influence of Magna Carta* at 39. Accordingly, in 1765, delegates from nine of the colonies met in New York and published a declaration of rights asserting their entitlement to all the common-law rights and liberties of English subjects. 2 James Kent, *Commentaries on American Law*, 5 (3d ed 1836). In the same vein, the first Continental Congress in 1774 adopted a Declaration of Rights asserting not only that the inhabitants of the English colonies in North America were entitled to life, liberty, and property by the immutable laws of nature, but also that they were entitled to the common law and statutory law of England and to all the immunities and privileges granted and confirmed by royal charters. The 1774 Declaration of Rights reflected the principle of English law that English subjects carried with them, as their birthright, the laws of England. *Id.*

Two years later, in 1776, the Declaration of Independence restated the colonists' right to continue to enjoy the ancient rights of the English Constitution at the same time that it pleaded a legal case for political independence. Hall, *Magic Mirror* at 59. After the Revolution, all the states continued the operation of the common law within their borders.

Webster, *Comparative Study* at 70.[8] Accordingly, courts continued to apply common-law remedies for injuries to absolute rights.

Shortly before the Revolution, the Continental Congress had recommended to the colonies that they establish independent governments. By the end of 1776, several of the colonies—now states—had adopted constitutions and had prefaced them with declarations or bills of rights that stated "in dogmatic form all of the seminal principles of the English constitutional system." C. Ellis Stevens, *Sources of the Constitution of the United States*, 34, 38 n 1 (1894).[9] After the Revolution, however, the function of declarations or bills of rights was to safeguard against arbitrary power of all kinds, not merely the Crown or Parliament. Willi Paul Adams, *The First American Constitutions*, 145 (1980).

Few of the original states formed constitutional conventions to draft their constitutions. Most states left the task to their legislatures, or general courts. Allan Nevins, *The American States During and After the Revolution: 1775-1789*, 137 (1924).[10] Not surprisingly, the drafters of the first state constitutions drew on their own colonial institutions and charters, which included the tenets of the common law as they understood them. Donald S. Lutz, *The Origins of American Constitutionalism*, 62 (1988); *see* Nevins, *The American States During and After the Revolution* at 1 ("Almost all of the

---

[8] *See* Stevens, *Sources of the Constitution of the United States* at 34 ("[The American Revolution] was fought on the part of the colonists in defense of what they held to be their rights as men of the English blood."); *Report of the Committee Upon the Duty of Courts to Refuse to Execute Statutes in Contravention of the Fundamental Law*, 38 Report of New York State Bar Assoc, 230, 238 (1915) ("[T]he American Revolution was a lawyers' revolution to enforce Lord Coke's theory of the invalidity of Acts of Parliament in derogation of common right and of the rights of Englishmen.").

[9] New Jersey had adopted a constitution that did not contain a separate bill of rights. However, the New Jersey Constitution embedded many recognized liberties in the body of the document (*e.g.*, trial by jury, right to counsel, free exercise of religion). 1 Schwartz, *The Bill of Rights* at 234 ff.

[10] Constitutions were drafted with amazing speed—New Hampshire's in only a week; Delaware's, one of the few that was drafted by a convention, in less than a month. Nevins, *The American States During and After the Revolution* at 128, 138. There was no time for lengthy deliberation and debate about fundamental principles because, at the same time, the writers of those constitutions had to attend to pressing matters such as war, the economy, and statute-writing. *Id.* at 136.

early state constitutions descend directly from Colonial institutions."). There were few practical guides available to the drafters of state constitutions, apart from the existing royal and proprietary charters, the writings of Coke, Care, Penn, and Blackstone, and the philosophy of English revolutionists. Nevins, *The American States During and After the Revolution* at 126.

Declarations or bills of rights in state constitutions reflected the broad, deep foundations of English rights as those rights were understood at the time, but drafters restated their common-law rights as natural rights. Webster, *Comparative Study* at 384-85. The most significant legal provisions in the early bills of rights were taken from the *Second Institute* in an effort to give concrete content to the common-law rights of Englishmen. Roscoe Pound, *The Formative Era of American Law*, 98 (1938).[11]

Our historical inquiry to this point reveals that the common law had a powerful influence on the American colonists' understandings of their legal rights as private individuals in their relations with one another, as well as on their understandings of their rights and liberties in relation to government. Consistent with the writings of Blackstone and eighteenth century revolutionary writers, the colonists viewed some of their rights—including those respecting person, property, reputation, and liberty—as "absolute." The drafters of the first state constitutions sought to protect absolute rights by prefacing their constitutions with bills or declarations of rights that both prohibited official interference with some rights and mandated how the government was to protect other rights. In writing those bills or declarations of

---

[11] The common law also had a significant impact on federal law. For example, the Northwest Ordinance of 1787, the first federal document to contain a bill of rights, contained six articles that Congress stated would extend and "fix forever" in the Northwest Territory fundamental principles of civil liberty. 1 Henry Steele Commager, *Documents of American History*, 130 (8th ed 1968). One of the guarantees was that "[t]he inhabitants of the said territory shall always be entitled to * * * judicial proceedings according to the course of the common law." *Id.* Another was that "[n]o man shall be deprived of his liberty or property, but by the judgment of his peers or the law of the land." *Id.* at 130-31. Both guarantees were intended to "bridle the new national government." Leonard W. Levy, *Original Intent and the Framers' Constitution*, 146 (1988); *see also* Hazeltine, *The Influence of Magna Carta*, 17 Colum L Rev at 31 (bills of rights in American constitutions "delimit" government powers).

rights, the drafters looked to the common law, as it was described to them in sources that included Coke's *Second Institute*, to identify the rights that they sought to protect. Coke's commentary on the second sentence of Chapter 29 of the Magna Carta of 1225, describing the common-law guarantee of remedy by due course of law for injury to goods, land, or person, evidently provided the framework and phraseology for remedy clauses that first appeared in state declarations of rights beginning in 1776. John H. Bauman, *Remedies Provisions in State Constitutions and the Proper Role of the State Courts*, 26 Wake Forest L Rev 237, 243-44 (1991).

### 4. *Early Remedy Clauses*

The states of Maryland and Delaware were the first to place remedy clauses in their declarations of rights. Both states had been proprietary colonies before the Revolution and, as noted earlier, their governors had guaranteed to the residents of those colonies the rights of Englishmen. The remedy clauses of both states' constitutions echoed Coke's, Care's, and Penn's commentaries on the second sentence of Chapter 29 of the Magna Carta of 1225.[12]

---

[12] Section XVII of the Maryland Declaration of Rights of 1776 provided:

"That every freeman, for any injury done him in his person or property, ought to have remedy, by the course of the law of the land, and ought to have justice and right freely without sale, fully without any denial, and speedily without delay, *according to the law of the land*."

1 Schwartz, *The Bill of Rights* at 281 (emphasis added). Section XXI provided that no free man should be deprived of life, liberty, or property except by the judgment of peers "or *by the law of the land*." *Id.* at 282 (emphasis added). The Maryland Declaration of Rights used the phrase "by the law of the land" in referring to remedy for both private injuries to person or property and to official actions depriving a person of life, liberty, or property.

Section 12 of the Delaware Declaration of Rights of 1776 also closely paraphrased commentaries on the second sentence of Chapter 29 of the Magna Carta of 1225:

"That every freeman for every injury done him in his goods, lands or person, by any other person, ought to have remedy by the course of the law of the land and ought to have justice and right for the injury done to him freely without sale, fully without any denial, and speedily without delay, *according to the law of the land*."

1 Schwartz, *The Bill of Rights* at 277-78 (emphasis added).

None of the remedy clauses adopted after 1776 used the phrase "by the law of the land." Instead, beginning with the Pennsylvania Constitution of 1790, the preferred phrasing was "due course of law" or "the due course of law." *See generally Sources and Documents of United States Constitutions* (William F. Swindler ed.

After 1776, the drafters of other state constitutions apparently looked to Maryland and Delaware, if not directly to Coke, Care, or Penn, in crafting their remedy clauses. *See* Howard, *Road From Runnymede* at 485-86 (Appendix O, listing state constitutions with remedy clauses derived from Coke or variants thereon).[13] Clauses guaranteeing remedy for injury to absolute common-law rights became more common after 1780, as constitution writers realized that unrestrained state legislative power was as much a threat to the security of individual rights as unrestrained parliamentary and royal power had been. *See* Gordon S. Wood, *The Creation of the American Republic 1776-1787*, 448-49 (1969) (by 1780s, growing awareness that legislative power is "essentially no different from magisterial power"); *see also* Haines, *American Doctrine* at 40-61 (describing theory of constitutions as fundamental laws unalterable by legislatures).

As noted, the drafters wrote the Oregon Constitution and its Bill of Rights in 1857. As part of our effort to understand the wording of Oregon's remedy clause in light of the way that wording would have been understood and used by those who wrote the provision, *Vannatta*, 324 Or at 530, and as a way of bridging the period from the immediate aftermath of the American Revolution to the middle of the nineteenth century, we turn to an examination of the historical evolution of the remedy clause in Indiana, whose constitution of 1851 was the primary source for the Oregon Constitution. Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857*, 28 (1926).

---

1975) (quoting texts of remedy clauses in constitutions of Pennsylvania, Kentucky, Ohio, Mississippi, Connecticut, Massachusetts, Alabama, Texas, Tennessee, and the 1838 territorial constitution of Florida). *See* Charles Groves Haines, *The Revival of Natural Law Concepts*, 104 (1965) (phrase "by the law of the land" transformed into more popular form "due process of law").

[13] Maryland and Delaware both abandoned their original constitutions. Maryland, however, retained the wording of its remedy clause in its constitutions of 1851, 1864, and 1867. *See* 4 *Sources and Documents of United States Constitutions* at 394, 418, 449 (reproducing constitutions). Delaware, by contrast, expanded its remedy-clause guarantee to include "reputation" and "movable or immovable possessions" in its constitution of 1792, and provided that remedy would be by "the due course of law." *Id.* at 206. The text of the Delaware remedy clause has not changed since 1792. *See id.* at 206, 217, 237 (setting out Delaware constitutions).

### 5.  *Indiana Remedy Clause*

The territory of Indiana, which had been governed by the Northwest Ordinance of 1787, was admitted into the union in 1816. 1 Charles Kettleborough, *Constitution Making in Indiana*, 65 (1971). The Indiana Bill of Rights followed the model of other Midwestern states, such as Ohio and Kentucky.[14] William P. McLauchlan, *The Indiana State Constitution: A Reference Guide*, 3 (1996). Article I, section 11, of the Indiana Constitution of 1816, provided:

> "That all Courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of law; and right and justice administered without denial or delay."

That phrasing was virtually identical to Article X, section 13, of the Kentucky Constitution of 1799.

By the 1840s, there was considerable dissatisfaction in Indiana with the constitution of 1816, primarily because that constitution had not proved to be an adequate restraint on legislative power. 1 Kettleborough, *Constitution Making* at 186-87. Article III, section 25, of the 1816 constitution, had provided for annual sessions of the legislature, and the constitution had imposed few restraints on legislative powers. *Id.* at 95-96. Specific complaints in the 1840s were that the legislature was enacting too many laws and that too many of those laws were local and private in nature. *Id.* at 183, 186-87. Citizens of Indiana were not alone in distrusting legislative power. One of the notable features of all state constitutions that were drafted in the mid-nineteenth century was the mistrust of legislative power. Amasa M. Eaton, *Recent State Constitutions*, 6 Harv L Rev 109, 109 (1892); *see* Hall, *Magic Mirror* at 89 (populist and antigovernmental stirrings

---

[14] Article VIII, section 7, of the Ohio Constitution of 1802, provided:

"That all courts shall be open, and every person, for an injury done him in his lands, goods, person or reputation, shall have remedy by the due course of law, and right and justice administered, without denial or delay."

Article X, section 13, of the Kentucky Constitution of 1799, provided:

"That all courts shall be open, and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of law; and right and justice administered, without sale, denial or delay."

of late 1840s and 1850s "climaxed in an outburst of constitutional reform that diminished legislative power").

The Indiana Constitutional Convention of 1850 made fundamental changes to that state's original constitution, including limiting the legislature to biennial sessions (Article IV, section 9) and prohibiting the legislature from passing local or special laws (Article IV, section 22). 1 Kettelborough, *Constitution Making* at 314, 318-19. The convention also rewrote various provisions of Indiana's Bill of Rights to assure that the legislature would not invade the rights that were protected therein.

Article I, section 11, of the Indiana Constitution of 1816, was one of the provisions that the convention revised. Renumbered as Article I, section 12, of the Indiana Constitution of 1851, the convention rewrote it to provide:

> "All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

1 Kettleborough, *Constitution Making* at 297-98. Unlike the one-sentence version in the 1816 constitution, the 1851 provision consisted of two sentences, each addressing different guarantees. The first sentence guaranteed both open courts and the right to remedy by due course of law for injury to person, property, or reputation. The second sentence prescribed how justice must be administered, and the delegates added requirements that had not been present in the 1816 constitution, including the requirement that justice be administered completely, as well as freely; without purchase; and speedily, without denial or delay.

The decisions to restructure Article I, section 12, to make the remedy clause an independent clause and to add the requirement that justice be administered completely are indications that the drafters of the Indiana Constitution of 1851 intended to secure more firmly than had been done in the 1816 constitution the common-law right to remedy for injury to absolute rights concerning person, property, and reputation. The evolution of the remedy clause in the Indiana

Bill of Rights thus indicates that the commitment to protecting absolute common-law rights had strengthened, not waned, with the passage of time.

We have found no cases construing the Indiana remedy clause before the Oregon Constitution was adopted in 1857. However, legal commentaries and case law from other jurisdictions provide insight into the rights that remedy clauses were intended to protect and how the key terms "remedy," "due course of law," and "injury" were understood during that era. We turn to an examination of those sources.

6. *Commentaries and Case Law from Other Jurisdictions*

The commitment to natural rights was strong in the nineteenth century, just as it had been in the eighteenth century and before. New York Chancellor James Kent, for example, identified personal security (including reputation), personal liberty, and the right to acquire and enjoy property as absolute rights. 2 Kent, *Commentaries* at 1, 15. Kent described absolute rights as natural, inherent, and unalienable, *id.* at 1, and explained that the function of bills of rights is to guard absolute rights from attack in the ordinary course of public affairs, *id.* at 8. Similarly, the Ohio Supreme Court, in construing that state's remedy clause, referred to reputation as a "sacred right of every person," *Fisher v. Patterson*, 14 Ohio 418, 426 (1846), and the Mississippi Supreme Court, in a case involving that state's remedy clause, described liberty and property as fundamental, sacred rights. *Commercial Bank of Natchez v. Chambers et al.*, 16 Miss 9, 57 (1847).

It also was well established in the nineteenth century that, at a minimum, a "remedy" was a means for enforcing a legal right. In *Marbury v. Madison*, 5 US (1 Cranch) 137, 163, 2 L Ed 60 (1803), the United States Supreme Court held that the "very essence of civil liberty * * * consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." That rule rested on Blackstone's assertion that " 'it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law wherever that right is invaded,' " and that " 'every right, when withheld, must have a remedy, and

every injury its proper redress.' " *Id.* (quoting Blackstone's *Commentaries*).

Kentucky's highest court made a similar statement in *Davis v. Ballard*, 24 Ky (1 JJ Marsh) 563 (1829). The court explained that no one is secure in the enjoyment of life, liberty, or property unless the government provides an opportunity for redress if those rights are injured. *Id.* at 568. The court held that the remedy clause in Article X, section 13, of the Kentucky Constitution, imposes on "the functionaries of the government" the duty to assure the availability of a remedy for injury. *Id.*

Courts assumed that common-law remedies provided constitutionally adequate remedies for injuries to recognized rights. Nonetheless, they acknowledged legislative authority to alter remedies, so long as the alterations did not infringe on absolute, or vested, rights. *See Gooch v. Stephenson*, 13 Me 371, 376-77 (1836) (so stating). If legislatively enacted remedies did infringe on such rights, courts invalidated those remedies. Thus, in *Riggs, Peabody & Co. v. Martin*, 5 Ark 506, 508-09 (1844), the Arkansas Supreme Court declared unconstitutional a statute that prohibited a person from asserting rights to probate estates unless the person took an oath in open court stating that he had given the estate credit for all payments and offsets to which the estate was entitled. The court held that the legislature lacked authority to impose the open-court oath requirement:

> "The Legislature certainly does not possess the power to cut off all remedy on demands against the estate of deceased persons, or so to impair the right or clog its assertion as to render it inoperative or valueless."

*Id.* at 508.

Courts in the nineteenth century also evaluated legislatively created remedies by examining whether they satisfied "due course of law," "due process of law," or "law of the land" requirements. As they had in Coke's time, those phrases continued to share an "identity of meaning" in the nineteenth century. Theodore Sedgwick, *A Treatise on the Rules Which Govern the Interpretation and Application of Statutory and Constitutional Law*, 534, 534 n † (1857). State

as well as federal courts viewed the phrases as imposing an "important limitation" on the exercise of legislative power. *Id.* at 534. For example, in *Townsend v. Townsend*, 7 Tenn (Peck) 1, 14 (1821), the Supreme Court of Tennessee stated that the remedy clause in Article XI, section 7, of the Tennessee Constitution, which guaranteed remedy by due course of law for injury to lands, goods, person, or reputation, imposed a "restriction * * * upon legislative and all other power." The legislature was not free to barter away constitutional rights, because they were "vested, unexchangeable, and unalienable." *Id.* at 12. In *Davis*, 24 Ky (1 JJ Marsh) at 571, the court held that the remedy clause in Article X, section 13, of the Kentucky Constitution, which guaranteed remedy by due course of law for injury to lands, goods, person, or reputation, was one of the constitutional provisions that imposed a duty on the judiciary to declare laws unconstitutional.

Courts also held that "law of the land" provisions in bills of rights imposed restraints on legislative power. In *Jones' Heirs v. Perry*, 18 Tenn (10 Yer) 59, 71 (1836), for example, the Tennessee Supreme Court explained:

> "The only means by which the legislature can be kept within the bounds of the constitution, in times of high political excitement, is to accustom its members to the restraints it imposes, and to check their assumption of an excess of power promptly whenever the case occurs."

*See also Westervelt v. Gregg*, 12 NY 202, 209 (1854) (due process of law does not mean any act legislature might think fit to pass "in the uncontrolled exercise of its power"); *Hoke v. Henderson*, 15 NC (4 Dev) 1, 12 (1833) *rev'd on other grounds Mial v. Ellington*, 134 NC 131, 46 SE 961 (1903) (phrase "law of the land" does not mean any act of general assembly).

Notwithstanding their duty to determine whether legislatively enacted remedies satisfied due course of law, due process of law, or law of the land requirements, courts approached their evaluative task with the presumption that the legislature had intended to provide a constitutionally adequate remedy for injury to protected rights. In *Schuylkill Navigation Company v. Loose*, 19 Pa 15, 18 (1852), for example, the Pennsylvania Supreme Court explained that the remedy clause in Article IX, section 11, of the Pennsylvania

Constitution, had descended from the common-law guarantee that " 'justice and right shall be denied * * * to no one.' " (quoting Magna Carta). Because the common law and the constitution guaranteed "right," or remedy, for injury, the court explained, it would evaluate remedial statutes that were substitutes for common-law remedies with a presumption that the legislature intended to provide remedies for injury that at least were equivalent to those that had been provided at common law. *Id.*

Finally, in our examination of historical sources providing insight into the meaning of the key terms in state constitutional remedy clauses, we turn to nineteenth century case law construing the word "injury." As they had in previous centuries, courts continued to view "injury" as any violation of a right or any wrong done to a right. In *Parker v. Griswold*, 17 Conn 288, 295 (1845), for example, the question was whether the defendant had injured the plaintiff's land by diverting water away from a stream that ran through it. The defendant had argued that no injury had occurred merely because less water had come to the plaintiff's land. *Id.* at 295. The Connecticut Supreme Court rejected that argument, explaining:

> "An injury is a wrong; and for the redress of every wrong there is a remedy: *a wrong is a violation of one's right; and for the vindication of every right there is a remedy.* Want of right and want to remedy are justly said to be reciprocal. Where therefore there has been a violation of a right, the person injured is entitled to an action."

*Id.* at 303 (emphasis added). Courts also held that remedy clauses addressed "every possible injury which a man may sustain and which affects him in respect to his real or personal property, or in respect to his person or reputation * * *." *Townsend*, 7 Tenn (Peck) at 14; *see also Parker*, 17 Conn at 303 (for vindication of right that is injured or wronged, law supplies a remedy through some form of action).[15]

---

[15] Contrary to one commentator's assertion, *Sharpless v. Mayor of Philadelphia*, 21 Pa 147 (1853), does not support a contrary view. *See* Hoffman, *Origins of the Open Courts Clause* at 1290 and n 65 (*Sharpless* authority for theory that remedy clauses in state constitutions merely intended to assure judicial independence). In *Sharpless*, the question was whether two Pennsylvania statutes authorizing the City of Philadelphia to issue bonds to raise revenue to subscribe to

In sum, when the Oregon Constitutional Convention convened in 1857, courts and commentators had provided considerable insight into the background and meaning of remedy clauses in state declarations or bills of rights. Those cases and commentaries revealed that the purpose of remedy clauses was to protect "absolute" common-law rights. For injuries to those rights, the remedial side of the common law had provided causes of action that were intended to restore right or justice. Remedy clauses mandated the continued availability of remedy for injury to absolute rights. The requirement that remedy be by due course or due process of law was intended as a limitation on the legislature's authority when it substituted statutory remedies for common-law remedies. It was the duty of courts to enforce those restraints in evaluating whether particular statutory remedies satisfied the requirement that remedy be by "due course of law." *See* 2 Kent, *Commentaries* at 13 n b (not every act of legislature reflects "law of the land"); Haines, *American Doctrine* at 63-121 (discussing state court decisions between 1778 and 1819 establishing practice of "judicial control of legislative acts"). With that background, we turn to the drafting and adoption of the remedy clause in Article I, section 10, of the Oregon Constitution.

---

shares of stock in two railroad companies violated Article IX, section 9, of the Pennsylvania Constitution, which prohibited the state from taking private property without compensation. 21 Pa at 164. In seriatim opinions, the three justices of the Pennsylvania Supreme Court in the majority held that the revenue statute was within the legislature's power to tax.

In his opinion, Justice Black canvassed every provision of the Pennsylvania Constitution that might have had relevance to the scope of the legislature's taxing powers. *Id.* at 164-65. Regarding the remedy clause in Article IX, section 11, he wrote:

"[Article IX, section 11,] was clearly intended to insure the constant and regular administration of justice between man and man. To say that it is violated by refusing a judicial remedy for bad legislation, would be straining it sadly. Certainly a contract, such as that which the defendants propose to make, however it may injure the plaintiffs, is not an injury for which they are entitled to redress if it be lawful to make it."

*Id.* at 166. Justice Black's observations, in *dicta*, about the remedy clause were that the clause played no role in resolving whether the legislature properly had exercised its taxing power because the remedy clause addressed only private injuries.

### 7. *Oregon Constitutional Convention*

The Oregon Constitutional Convention convened on August 17, 1857, and elected territorial Justice Matthew Deady as its president. Carey, *The Oregon Constitution* at 27. Many of the delegates came from states that had undertaken constitutional reform in the late 1840s. David Alan Johnson, *Founding the Far West*, 142 (1992). Nineteen of the 60 delegates were lawyers. Charles H. Carey, *General History of Oregon*, 511 (3d ed 1971). Like their Indiana counterparts, the drafters of the Oregon Constitution were leery of legislative power. They limited the legislature to biennial sessions, Article IV, section 10, imposed a single-subject limitation on all acts, Article IV, section 20, prohibited the enactment of special or local laws, Article IV, section 23, and required a majority of all the members—rather than a majority of a quorum—to enact all laws, Article IV, section 25. *See* Carey, *The Oregon Constitution* at 390 (explaining reasons for wanting to restrain legislative power).

Early in the convention, lawyer-delegate Delazon Smith, who had studied other states' constitutions, proposed creating a committee on the bill of rights. *Id.* at 76, 100. Smith argued that a bill of rights was "a sort of textbook of weighty matters" that would command the respect of the people and the attention of the courts, and would limit the fractious spirit of the majority if it tried to infringe on the rights of the individual citizen. *Id.* at 102.

The delegates created a seven-member committee on the bill of rights headed by lawyer-delegate Lafayette Grover. *Id.* at 107. The committee submitted a proposed bill of rights less than a week later. *Id.* at 117. Many of the provisions were identical to the bill of rights of the Indiana Constitution of 1851. *See* W.C. Palmer, *The Sources of the Oregon Constitution*, 5 Or L Rev 200, 201-02 (1926) (comparing Oregon and Indiana bills of rights). The committee recommended the following wording for the provision that became Article I, section 10, of the Oregon Constitution:

"No tribunal shall be secret, but justice shall be administered openly and without purchase, completely and without delay; and every man shall have remedy by due course

of law for injury done him in his person, property, or reputation."

Carey, *The Oregon Constitution* at 120. In the final version, the convention substituted the word "court" for the word "tribunal." *Id.* at 327. The convention adopted the Bill of Rights on September 12, 1857. *Id.* at 343.

There is no record of the debates surrounding the changes that the committee on the Bill of Rights made to Article I, section 10. However, in the short time that the committee devoted to drafting the Bill of Rights for the Oregon Constitution, it rewrote Article I, section 12, of the Indiana Constitution of 1851, rather than merely adopting the Indiana provision verbatim. The committee reorganized the provision to express in one clause all the requirements relating to open courts and judicial administration. It expressed in a separate, independent clause the guarantee of remedy by due course of law for injury to person, property, or reputation. The decision to express in a separate, independent clause the guarantee of remedy by due course of law for injury to person, property, or reputation indicates that the drafters of the Oregon Constitution believed that the right to a remedy for injury to those rights needed to be stated clearly and unambiguously in the Oregon Bill of Rights.

Evidence of the scope of the drafters' intent when they wrote the remedy clause in section 10 of the Oregon Bill of Rights admittedly is sketchy. However, we find no indication that the drafters sought to depart from the historical purpose of remedy clauses, which was to mandate the availability of a remedy by due course of law for injury to absolute rights respecting person, property, and reputation. That the drafters of Article I, section 10, of the Oregon Constitution, rewrote and reorganized Article I, section 12, of the Indiana Constitution of 1851, rather than merely adopting that provision verbatim as they did several other provisions of the Indiana Bill of Rights, demonstrates that the drafters gave careful thought to the structure and wording of Article I, section 10. Their choice to express in one clause how justice is to be administered, and to reserve for a separate, independent clause the requirement of remedy by due course of law for injury to person, property, or reputation, indicates that the

drafters regarded the remedy clause as providing substantive protection to those absolute common-law rights. Viewed in the context of the historical tradition that gave rise to remedy clauses in other state constitutions, and the mistrust of legislative power that pervaded the mid-nineteenth century, we conclude that the drafters of Article I, section 10, sought to give constitutional protection to absolute rights respecting person, property, and reputation as those rights were understood in 1857, and that the means for doing so was to mandate the availability of remedy by due course of law in the event of injury to those rights. That remedy must be by due course of law is a directive to courts, as the guardians of constitutional rights, to determine the constitutionality of legislatively created remedies respecting such rights.

Having examined the text of the remedy clause, and the historical circumstances leading to its adoption, we now turn to Oregon case law surrounding the provision. *See Priest*, 314 Or at 415-16 (prescribing sequence of analysis).

## C. *Oregon Supreme Court Case Law*

This court's case law surrounding Article I, section 10, is extensive. We review that case law first by considering cases analyzing the rights that the remedy clause protects, then cases analyzing its key terms: remedy, due course of law, and injury.

### 1. *Rights Protected by the Remedy Clause*

This court has stated that the guarantee of remedy by due course of law for injury to person, property, or reputation "is one of the most sacred and essential of all the constitutional guaranties" and that "without it a free government cannot be maintained or individual liberty be preserved." *Gearin v. Marion County*, 110 Or 390, 396, 223 P 929 (1924). This court also has stated that the purpose of the remedy clause is to make the common-law maxim that there is no wrong without a remedy "a fixed and permanent rule of law in this state." *Platt v. Newberg et al.*, 104 Or 148, 153, 205 P 296 (1922). Those statements reflect this court's understanding that certain common-law rights are absolute rights that must be protected from infringement.

Consistent with the foregoing observations, this court for many years held that the purpose of the remedy clause "is to save from legislative abolishment those jural rights which had become well established prior to the enactment of our Constitution." *See Stewart v. Houk et al,* 127 Or 589, 591, 271 P 998, *on reh'g* 272 P 893 (1928) (so stating and citing eight previous cases so holding). *Stewart* involved the constitutionality of a 1927 statute, which provided that " '[a]cceptance of a free ride as a guest in a motor vehicle shall be presumed to be a waiver of said guest of liability for accidental injury caused by [the] owner or driver of such motor vehicle.' " *Id.* at 591 (quoting statute). The court held that the statute violated the remedy clause. It reasoned:

> "[I]f the buttress erected by this constitutional provision for the safeguarding of long-established rights can be pierced by this piece of legislation, an entry will be effected through which may come other legislation in substitution for the safeguarded common-law rights. It is clear we possess no power to sanction the entry and the substitution."

*Id.* at 596. The holding in *Stewart* was consistent with previous cases in which the court had held that, under the remedy clause, "[v]ested rights are placed under constitutional protection, and cannot be destroyed by legislation." *Templeton v. Linn County,* 22 Or 313, 318, 29 P 795 (1892).

Soon after this court's decision in *Stewart,* the United States Supreme Court decided *Silver v. Silver,* 280 US 117, 50 S Ct 57, 74 L Ed 221 (1929). That decision presaged an alteration in the course of this court's Article I, section 10, jurisprudence. In *Silver,* the issue was whether the Connecticut guest-passenger statute, which barred a gratuitous guest from recovering for injuries caused by ordinary negligence in the operation of an automobile but not other modes of transportation, violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[16] *Id.* at 122. The Connecticut Supreme Court had held that the statute did not violate the Equal Protection

---

[16] The plaintiff in *Silver* did not challenge the validity of the Connecticut guest-passenger statute under that state's remedy clause. She limited her argument to the contention that the statute violated the Equal Protection Clause of the Fourteenth Amendment.

Clause, *Silver v. Silver*, 108 Conn 371, 143 A 240 (1928), and the United States Supreme Court affirmed, *Silver*, 280 US at 122. The Supreme Court explained that the Equal Protection Clause "does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." *Id.*

Thereafter, in 1935, in *Perozzi v. Ganiere*, 149 Or 330, 345, 40 P2d 1009 (1935), this court relied on *Silver* in upholding Oregon's 1929 guest passenger statute against a remedy clause challenge. That statute barred causes of action against drivers of motor vehicles by gratuitous guests who had been injured, unless the plaintiff could show that the accident was intentional or had been caused by gross negligence, intoxication, or reckless disregard for the rights of others. *Id.* at 331. The plaintiff in *Perozzi* relied on *Stewart* for the proposition that the 1929 statute, like its predecessor, deprived her of a remedy for the injury that she had suffered to her person when the car in which she was riding overturned as a result of the defendant's careless and negligent driving. *Id.* at 330-31. In rejecting the plaintiff's challenge, the court cited *Silver* for the proposition that the remedy clause in Article I, section 10, of the Oregon Constitution, does not prohibit the legislature from creating new rights or abolishing old rights recognized at common law.[17] *Id.* at 333.

As our analysis to this point makes clear, the *Perozzi* court erred in relying on the United States Supreme Court's analysis of the Equal Protection Clause in *Silver* for its interpretation of the rights protected by the Oregon remedy clause. The Equal Protection Clause and the remedy clause address distinctly different constitutional concerns. As this court correctly had held on many occasions before *Perozzi*, the purpose of the remedy clause in Article I, section 10, is to protect absolute common-law rights respecting person, property, and reputation by guaranteeing the availability of a remedy in the event of an injury. The purpose of the Equal

---

[17] The *Perozzi* court also rejected the plaintiff's contention that Article I, section 10, preserves all common-law remedies and that it is not within the province of the legislature to take away or limit remedies in any way. *Perozzi*, 149 Or at 345-47. We discuss that aspect of *Perozzi* later in this opinion.

The legislature repealed the guest passenger statute, ORS 30.110, in 1961. Or Laws 1961, ch 578, § 1.

Protection Clause, which was added to the United States Constitution after the Civil War, is to assure that all persons are treated equally by the law. Nonetheless, beginning with *Perozzi*, the United States Supreme Court's interpretation of the Equal Protection Clause of the Fourteenth Amendment in *Silver*, rather than the text, history, and this court's prior interpretations of the remedy clause, became the basis for this court asserting, in subsequent cases, that the legislature may abolish absolute common-law rights without violating Article I, section 10. As our review of subsequent cases will show, that error has had significant consequences.

In *Noonan v. City of Portland*, 161 Or 213, 249, 88 P2d 808 (1939), this court again relied on *Silver* in holding that Article I, section 10, "was not intended to give anyone a vested right in the law either statutory or common * * *." The court reiterated that point in *Josephs v. Burns & Bear*, 260 Or 493, 503, 491 P2d 203 (1971), again relying on *Silver*. Other remedy-clause cases examining the rights that are protected by Article I, section 10, likewise have relied on *Perozzi*, *Noonan*, and *Josephs*. *See, e.g.*, *Holden v. Pioneer Broadcasting Co. et al*, 228 Or 405, 412-13, 365 P2d 845 (1961) (citing *Perozzi* and *Noonan* for proposition legislature may modify fault principle);[18] *Sealey v. Hicks*, 309 Or 387, 393-94, 788 P2d 435 (1990) (citing *Josephs* for proposition that legislature can determine what constitutes legally cognizable injury); *Hale v. Port of Portland*, 308 Or 508, 521, 783 P2d 506 (1989) (citing *Noonan* for proposition that Article I, section 10, not intended to give anyone vested right in law).

■ As we have explained, the history of the remedy clause indicates that its purpose is to protect absolute common-law rights respecting person, property, and reputation, as those rights existed when the Oregon Constitution was drafted in 1857. The means for protecting those rights is the mandate that remedy by due course of law be available in the

---

[18] The *Holden* court acknowledged that, in upholding a statute that eliminated the right of a defamed person to recover general damages for inadvertent libel by certain news media when a retraction was made, it was adopting a minority view. 228 Or at 410.

event of injury. Until 1935, this court's case law was consistent with that historical purpose. In *Perozzi*, this court erroneously relied on the United States Supreme Court's interpretation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in *Silver* to hold that Article I, section 10, does not forbid the legislature from abolishing absolute rights respecting person, property, or reputation that existed when the Oregon Constitution was adopted. Subsequent cases, relying on *Perozzi* and *Silver*, have repeated that error. We disavow this court's holdings, beginning with *Perozzi*, that the legislature can abolish or alter absolute rights respecting person, property, or reputation that existed when the Oregon Constitution was drafted without violating the remedy clause in Article I, section 10.

### 2. *Remedy*

■       For rights that are protected by Article I, section 10, this court consistently has held that the law must provide a means for seeking redress for injury. *See, e.g., Thomas v. Bowen*, 29 Or 258, 264, 45 P 768 (1896) (Article I, section 10, furnishes adequate remedy for any infringement of right to preservation of good name); *Batdorff v. Oregon City*, 53 Or 402, 408-09, 100 P 937 (1909) (city ordinance limiting recovery for injury to instances of gross negligence leaves "remediless" person injured by ordinary negligence in violation of Article I, section 10). The legislature lacks authority to deny a remedy for injury to absolute rights that existed when the Oregon Constitution was adopted in 1857. *See Mattson v. Astoria*, 39 Or 577, 580, 65 P 1066 (1901) (Article I, section 10, intended to preserve common-law right of action).

■       Although this court has held that the remedy clause preserves common-law rights of action, *id.*, it never has held that the remedy clause prohibits the legislature from changing a common-law remedy or form of procedure, attaching conditions precedent to invoking the remedy, or perhaps even abolishing old remedies and substituting new remedies. *Id.* That is, the court never has held that the remedy clause freezes in place common-law remedies. However, just as the legislature cannot deny a remedy entirely for injury to constitutionally protected common-law rights, *id.*, neither can it substitute an "emasculated remedy" that is incapable of

restoring the right that has been injured, *West v. Jaloff*, 113 Or 184, 195, 232 P 642 (1925).[19]

### 3. *Due Course of Law*

For many years, this court viewed the phrase, "due course of law," as a guarantee of "due process of law," like that contained in the Fourteenth Amendment to the United States Constitution. In *Hough v. Porter*, 51 Or 318, 449, 98 P 1083 (1909), for example, the court identified Article I, section 10, as authority for the proposition that, "under the fundamental law of our land[,] all persons are entitled by due process of law to protection in their property rights, and to a speedy hearing of any controversy in respect thereto." In *Perozzi*, 149 Or at 350, the court again asserted that Article I, section 10, "is a 'due process of law' clause." Consistent with that view, this court held that the procedural requirements of Article I, section 10, are applicable to criminal proceedings, *see State v. Bouse*, 199 Or 676, 686, 264 P2d 800 (1953) (Article I, section 10, like Fourteenth Amendment, demands fair and impartial trial); to habeas corpus proceedings, *see Penrod/Brown v. Cupp*, 283 Or 21, 26, 581 P2d 934 (1978) ("Where the deprivation involves a constitutionally protected right, either Oregon's Article I, Section 10, or the federal fourteenth amendment obliges the state to provide some remedy in due course, or due process, of law."); and to prison discipline proceedings, *see Bonney v. OSP*, 270 Or 79, 91-92, 526 P2d 1020 (1974) ("in the inmate hearing context we choose to interpret Oregon's constitutional due process provision as

---

[19] Recently, this court has suggested that, in addition to being a means for seeking redress for injury, the word "remedy" also refers to the amount of damages that a person is entitled to recover for an injury. In *Hale*, for example, the court held that, under Article I, section 10, the legislature may limit the size of an award that can be recovered for an injury, so long as "the remedy is a substantial one." 308 Or at 523. *See also Greist v. Phillips*, 322 Or 281, 290, 906 P2d 789 (1995) (legislature entitled to amend amount of damages available in statutory wrongful death action without running afoul of Article I, section 10, "as long as the plaintiff is not left without a substantial remedy"); *Neher*, 319 Or at 426 (Article I, section 10, not violated so long as injured party has substantial remedy).

As we have explained, the only question in this case is whether the legislature has deprived plaintiff of a *means* for seeking redress for the injury that he alleges that he suffered at work. Accordingly, it is beyond the scope of this opinion to address issues relating to the adequacy of the amount of damages that may be available under a legislatively substituted process for a common-law cause of action for injury to one of the rights that is protected by the remedy clause.

mandating no greater rights than does the Fourteenth Amendment"). During the period that the court viewed the guarantee of "due course of law" as equivalent to "due process of law in the Fourteenth Amendment," it followed substantially federal court interpretations of the Fourteenth Amendment. *See School Dist. No. 12 v. Wasco County*, 270 Or 622, 632, 529 P2d 386 (1974) (so stating).

Justice Linde's concurrence in *Davidson v. Rogers*, 281 Or 219, 222-23, 574 P2d 624 (1978), set the stage for a different approach. He wrote:

> "The guarantee in article I, section 10, of a 'remedy by due course of law for injury done [one] in his person, property, or reputation' is part of a section dealing with the administration of justice. It is a plaintiffs' clause, addressed to securing the right to set the machinery of the law in motion to recover for harm already done to one of the stated kinds of interest, a guarantee that dates by way of the original state constitutions of 1776 back to King John's promise in Magna Carta chapter 40: 'To no one will We sell, to no one will We deny or delay, right or justice.' It is concerned with securing a remedy from those who administer the law, through courts or otherwise."

(Brackets in original; footnote omitted.) In 1982, in *Cole v. Dept. of Rev.*, 294 Or 188, 191, 655 P2d 171 (1982), this court adopted Justice Linde's view that the guarantee of remedy by due course of law is not equivalent to the guarantee of due process of law of the Fourteenth Amendment. Unlike the Due Process Clause in the Fourteenth Amendment, which evaluates the adequacy of the processes provided before government deprives a person of life, liberty or property, the remedy clause guarantees remedy by due course of law for injuries to person, property, or reputation that already have occurred. *Id.*; *see also State v. Wagner*, 305 Or 115, 145-56, 752 P2d 1136 (1988) (Article I, section 10, not equivalent to Fourteenth Amendment Due Process Clause); *State v. Hart*, 299 Or 128, 140, 699 P2d 1113 (1985) (same).

■ ■  Our historical inquiry in this case supports this court's holding in *Cole* that the remedy clause of Article I, section 10, is not a due process clause in the sense that due process is used in the Fourteenth Amendment to the United States Constitution. Nonetheless, the mandate in Article I,

section 10, that remedy be by due course of law for injury to person, property, or reputation, expresses a limitation on the exercise of legislative power. It is the duty of courts to evaluate the constitutionality of legislative enactments regarding the availability of remedies for injuries to rights that are protected by the remedy clause.

### 4. *Injury*

Judge Matthew Deady, who had served as the president of the Oregon Constitutional Convention in 1857, provided the first judicial explanation of the meaning of the term "injury" in the remedy clause:

> "[T]he remedy guarantied by [Article I, section 10,] is not intended for the redress of any novel, indefinite, or remote injury that was not then regarded as within the pale of legal redress. But whatever injury the law, as it then stood, took cognizance of and furnished a remedy for, every man shall continue to have a remedy for by due course of law. * * * If [a] then known and accustomed remedy can be taken away in the face of this constitutional provision, what other may not? Can the legislature, in some spasm of novel opinion, take away every man's remedy for slander, assault and battery, or the recovery of a debt?"

*Eastman v. County of Clackamas*, 32 F 24, 32 (D Or 1887). The word "then" appears to refer to the time when the drafters wrote the Oregon Constitution. Thus, according to Judge Deady, if there was a common-law cause of action for injury to person, property, or reputation in 1857, then the remedy clause mandates the continued availability of remedy for that injury. *Id.*

This court adopted Judge Deady's view of injury in *Theiler v. Tillamook County*, 75 Or 214, 217, 146 P 828 (1915). Earlier, this court had cited with approval decisions from other jurisdictions holding that "injury" means wrongs or harms to rights that are recognized by the common law, that is, for which common-law causes of action existed. *Mattson*, 39 Or at 580 (citing *McClain v. Williams*, 10 SD 332, 73 NW 72 (1897), and *Reining v. City of Buffalo*, 102 NY 308, 6 NE 792 (1886)). *See Stewart*, 127 Or at 592 (quoting *Mattson* for proposition that injury means wrongs for which

remedy must be available); *see also Cole*, 294 Or at 191 (procedural requirement that one pay assessed taxes before suing to have them refunded not type of injury contemplated by Article I, section 10).

■ In 1990, in *Sealey*, this court held that the legislature has authority to determine what constitutes a legally cognizable injury. 309 Or at 394. The *Sealey* court relied on *Josephs*, which in turn had relied on *Noonan* and *Silver*, for the proposition that the remedy clause does not give anyone a vested right in the law, either statutory or common. *See Josephs*, 260 Or at 503 (so stating). If it were true that the legislature had authority to declare what rights are protected by the remedy clause, then it would follow that the legislature also had plenary authority to define what constitutes a legally cognizable injury to those rights. However, as we have explained above, the remedy clause protects absolute common-law rights respecting person, property, and reputation that existed when the drafters wrote the constitution. If the legislature constitutionally cannot abolish or alter those rights directly, then it cannot abolish them indirectly by defining narrowly what constitutes an injury to those rights. We disavow the holding in *Sealey* that the legislature constitutionally is authorized to define what constitutes an injury to absolute rights respecting person, property, and reputation that are protected by Article I, section 10.

D. *Summary*

Having analyzed the remedy clause in the manner prescribed by *Priest* for interpreting an original provision of the Oregon Constitution, 314 Or at 415-16, we reach the following conclusions. As one of the provisions of the Oregon Bill of Rights, the remedy clause of Article I, section 10, protects rights respecting person, property, and reputation that, in 1857, the common law regarded as "absolute," that is, that derive from nature or reason rather than solely from membership in civil society. By the seventeenth century, the remedial side of the common law had developed to protect those rights in the event of injury by any other subject of the English realm. The function of common-law causes of action was to restore "justice" or "right" following injury. "Injury" at

common law meant any harm or wrong to absolute rights for which a cause of action existed.

Drafters of remedy clauses in state constitutions sought to protect absolute common-law rights by mandating that a remedy always would be available for injury to those rights. The drafters of the Oregon remedy clause identified absolute rights respecting person, property, and reputation as meriting constitutional protection under the remedy clause. As to those rights, the remedy clause provides, in mandatory terms, that remedy by due course of law shall be available to every person in the event of injury. The word "remedy" refers both to a remedial process for seeking redress for injury and to what is required to restore a right that has been injured. Injury, in turn, is a wrong or harm for which a cause of action existed when the drafters wrote the Oregon Constitution in 1857. A common-law cause of action is a constitutionally adequate remedy for seeking redress for injury to protected rights. However, the remedy clause does not freeze in place common-law causes of action that existed when the drafters wrote the Oregon Constitution in 1857. The legislature may abolish a common-law cause of action, so long as it provides a substitute remedial process in the event of injury to the absolute rights that the remedy clause protects. At a minimum, to be remedy by due course of law, the statutory remedy must be available for the same wrongs or harms for which the common-law cause of action existed in 1857. That is, if the common law provided a cause of action for an injury to one of the rights that the remedy clause protects, then a legislatively substituted remedial process must be available for that injury.

It follows from the foregoing that, in analyzing a claim under the remedy clause, the first question is whether the plaintiff has alleged an injury to one of the absolute rights that Article I, section 10 protects. Stated differently, when the drafters wrote the Oregon Constitution in 1857, did the common law of Oregon recognize a cause of action for the alleged injury? If the answer to that question is yes, and if the legislature has abolished the common-law cause of action for injury to rights that are protected by the remedy clause, then the second question is whether it has provided a constitutionally adequate substitute remedy for the common-law cause of action for that injury.

## E. *Analysis of This Case*

In light of the foregoing principles for analyzing claims under Article I, section 10, we turn to the specific issue to be decided in this case. At the outset, we emphasize that the issue is a narrow one. Plaintiff does not challenge the constitutionality of the workers' compensation system as a whole. Neither does he contend that the "exclusive remedy" provisions of ORS 656.018 (1995) *per se* are unconstitutional. Thus, unlike the plaintiff in *Evanhoff v. State Industrial Acc. Com.*, 78 Or 503, 154 P 106 (1915), plaintiff here does not assert that substituting the workers' compensation remedial process for the common-law cause of action by an employee against an employer for negligence violates Article I, section 10.[20] Moreover, and as context for the discussion that follows, we note that, since *Evanhoff* in 1915, this court implicitly has recognized the legislature's constitutional authority to substitute workers' compensation for the common-law negligence cause of action for work-related injuries. *See, e.g., Atkinson v. Fairview Dairy Farms*, 190 Or 1, 13, 222 P2d 732 (1950) ("The Workmen's Compensation Act has been held on a number of occasions to be constitutional."). Nothing in this case challenges those precepts. The constitutionality of the overall workers' compensation statutory program is not in question.

The narrow issue in this case is whether the exclusive remedy provisions of ORS 656.018 (1995) are unconstitutional under the remedy clause to the extent that there now is a category of workers who have been injured at work but receive no compensation benefits, because they cannot prove that the work-related incident was the *major* contributing cause of their injury or disease. From the perspective of the workers' compensation system, such workers are deemed to have suffered no injury and therefore are not entitled to compensation benefits. At common law, by contrast, injury was understood to be any wrong or harm to person, rights,

---

[20] The court in *Evanhoff* rejected the plaintiff's Article I, section 10, challenge on the ground that the workers' compensation scheme was voluntary, not compulsory. 78 Or at 517-19. In 1965, the legislature made workers' compensation insurance compulsory. Or Laws 1965, ch 285, § 5. With certain exceptions, the legislature also made workers' compensation the exclusive remedy for work-related injuries. Or Laws 1965, ch 285, § 6(2).

reputation, or property. *See Kinney v. SIAC*, 245 Or 543, 548-49, 423 P2d 186 (1967) (explaining common-law definition of injury as "any wrong or harm," and noting same definition of personal injury under then-existing workers' compensation law).

■    We turn to the facts of this case. Plaintiff contends that he was injured at work, that is, that he suffered a harm to his person in the form of severe and progressive respiratory problems, as well as other physical ailments, after he inhaled sulfuric, hydrochloric, and hydrofluoric acid mist and fumes while working in the pit in defendant's shop. Before his exposure, plaintiff had not experienced any of his symptoms. Because plaintiff was unable to prove that his work exposure was the major contributing cause of his disabling lung condition, however, he did not have a compensable injury under present workers' compensation law. Moreover, as we have explained, under ORS 656.018 (1995), workers' compensation purports to be the exclusive remedy for work-related injuries, whether or not a claim is a compensable claim. Thus, under present workers' compensation law, plaintiff was left with no means for seeking redress for the injuries that he alleges that he suffered at work and for which a common-law cause of action would have been available before the advent of the workers' compensation system.

After the ALJ had denied plaintiff's workers' compensation claim, plaintiff filed this negligence action. Defendant moved to dismiss for failure to state a claim. ORCP 21 A(8). Although defendant did not dispute that plaintiff might have suffered an injury at work, it argued that plaintiff had not suffered a compensable injury, as that term presently is defined in workers' compensation law, *see* ORS 656.802(2)(a) (to be compensable, claimant must prove work-related exposure was major contributing cause of occupational disease), and that ORS 656.018 (1995) makes workers' compensation the exclusive remedy for work-related injuries, whether or not a claim is compensable. In response to defendant's motion to dismiss, plaintiff argued, among other things, that the exclusive remedy provisions of ORS 656.018 (1995) violated the remedy clause of Article I, section 10. Plaintiff contended that the remedy clause guarantees the availability of a process for seeking redress for injuries that were recognized at

common law and that ORS 656.018 (1995) impermissibly eliminated the existence of a remedy for the injuries that he believes he suffered at work. The trial court granted defendant's motion to dismiss for failure to state a claim.

In affirming the trial court, the Court of Appeals reasoned that, under *Sealey*, the legislature has plenary authority to define what constitutes a "legally cognizable" injury. *Smothers*, 149 Or App at 54. Earlier in this opinion, we have explained why we now disavow that holding in *Sealey*. Under the remedy clause, if a cause of action existed for an injury to an absolute right respecting person, property, or reputation when the drafters wrote the Oregon Constitution, then either that cause of action or a legislatively created substitute process that provides a constitutionally adequate remedy for that injury must be available to every person.

The Court of Appeals also relied on *Kilminster v. Day Management Corp.*, 323 Or 618, 919 P2d 474 (1996), in holding that plaintiff in this case had no "right" that would support the argument that he had been deprived of a remedy. *Smothers*, 149 Or App at 55. In *Kilminster*, a worker died when he fell from a radio tower that his employer had ordered him to climb without providing adequate fall-protection equipment. *Id.* at 621. The decedent's parents brought an action for wrongful death under ORS 30.020(1). That statute gives a plaintiff a right to bring a wrongful death action only " 'if the decedent might have maintained an action, had the decedent lived.' " *Id.* at 626 (quoting statute). In other words, ORS 30.020(1) gives a plaintiff only a derivative right. *Id.* If the decedent in *Kilminster* had lived, then the "exclusive remedy" provisions of ORS 656.018 would have barred him from pursuing a common-law action against his employer. *Id.*

The plaintiffs in *Kilminster* argued that the "exclusive remedy" bar deprived them of their right to pursue a claim for the wrongful death of their son. *Id.* at 625. This court rejected that argument. It reasoned:

"Because the legislature has chosen not to provide decedent's parents with a wrongful death action based on a theory of negligence, *and because Oregon has no common law*

*action for wrongful death* [citations omitted], they have suffered no legally cognizable injury to their person, property, or reputation."

*Id.* at 627 (emphasis added).

Unlike the plaintiffs in *Kilminster*, plaintiff's right to remedy for injury in this case does not derive from a statute. Rather, plaintiff's right is grounded in the common law of negligence. Although Oregon has no common-law action for wrongful death, it does have a common-law action for negligence. The Court of Appeals erred in relying on *Kilminster* to affirm the trial court's dismissal of plaintiff's complaint in this case.

Having explained why the Court of Appeals' reliance on *Sealey* and *Kilminster* do not dispose of plaintiff's constitutional challenge in this case, we turn to an application of the methodology discussed earlier in this opinion for analyzing claims under the remedy clause. The first question is whether plaintiff has alleged an injury to one of the rights for which the remedy clause mandates that a remedy be available by due course of law. Plaintiff's complaint alleges that he suffered permanent injury to his lungs and that he suffers other physical ailments, because defendant negligently permitted mist and fumes from sulfuric, hydrochloric, and hydrofluoric acid to drift into the shop area and pit where plaintiff worked, was aware that exposure to them could cause harm to plaintiff, failed to provide plaintiff with proper safety instructions or protection from the chemicals, and failed to warn plaintiff that he would be exposed to the chemicals. To answer the first question, we must decide whether, when the drafters wrote the Oregon Constitution, the common-law of Oregon would have recognized an action for negligence under the circumstances of this case. We conclude that it would.

The territorial law of Oregon of June 27, 1844, provided, in part:

"[T]he Common Law of England and principles of equity, not modified by the statutes of Iowa or of this government, not incompatible with its principles, shall constitute a part of the law of this land."

Laws of Oregon 1843-49, Act of June 27, 1844, Art III, § 1, p 100 (1853). Article XVIII, section 7, of the Oregon Constitution, readopted territorial laws.[21] This court has held that, in their reference to the common law, the drafters of the Oregon Constitution "must have had reference to that law as it existed, modified and amended by the English statutes passed prior to the Revolution." *Peery v. Fletcher*, 93 Or 43, 53, 182 P 143 (1919).

It is undisputed that, at the time of the American Revolution, the common law recognized a cause of action for negligence. *See* J. H. Baker, *An Introduction to English Legal History*, 346-48 (2d ed 1979) (describing evolution of negligence tort). This court's case law is replete with cases involving that tort.

Our next, more specific, inquiry is whether at common law in Oregon in 1857, an employee would have had a cause of action against an employer for failure to provide a safe workplace and failure to warn of dangerous working conditions to which the employee would be exposed. That is, and unlike most other exercises in constitutional construction, the substantive content of the constitutional right can be established only by identifying the content of the common law in 1857. Although no Oregon cases addressed the common-law rights of employees to bring such negligence actions against their employers in the years immediately surrounding the creation of the Oregon Constitution, the content of the common law in 1857 may be divined from a wide range of sources. Cases from other jurisdictions, as well as Oregon cases decided within a relatively short period after 1857, are instructive.

In *Hough v. Texas and Pacific R.R. Co.*, 100 US 213, 25 L Ed 612 (1879), the United States Supreme Court addressed the duty that an employer owed to an employee and whether the negligence of a fellow servant relieved the employer of liability for injuries to the employee. The Court held that it was "firmly established" in American jurisprudence that employers, or masters, are obligated "not to

---

[21] Article XVIII, section 7, provides: "All laws in force in the Territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force until altered, or repealed."

expose the servant, when conducting the master's business, to perils or hazards against which he may be guarded by proper diligence on the part of the master." *Id.* at 217. The Court surveyed treatises, cases from state courts, and several English and Scottish cases from the mid-nineteenth century to demonstrate that the principle was well established. *Id.* at 219-24. Moreover, the Court noted, employees could not be presumed to assume the risk of dangers at work that they had no reason to believe they would encounter. *Id.* at 217.

In 1883, in a different negligence action brought by an employee against his employer, the Kansas Supreme Court explained:

> "In all cases, at common law, a master assumes the duty toward his servant of exercising reasonable care and diligence to provide the servant with a reasonably safe place at which to work, with reasonably safe machinery, tools and implements to work with, with reasonably safe materials to work upon, and with suitable and competent fellow-servants to work with him * * *."

*A.T. & S.F. Rld Co. v. Moore*, 29 Kan 632, 644 (1883). Only when the master himself had performed the duty imposed by the common law to provide a worker with a reasonably safe place to work, the court reasoned, did the fellow-servant or assumption-of-the-risk rules shield the employer from liability for negligence. *Id.* at 644-45; *see also Wilson v. Willimantic Linen Co.*, 50 Conn 433, 440-41 (1883) (same).

This court's first opportunity to address the question of an employer's common-law liability to an employee for negligence was in 1888. In *Anderson v. Bennett*, 16 Or 515, 19 P 765 (1888), the plaintiff, a laborer who had been hired to help construct a tunnel for the Northern Pacific Railroad Company, was blinded when his supervisor negligently ordered him to drill a hole in some rock and the drilling caused an explosion. *Id.* at 516-17. The plaintiff's employer sought to avoid liability on the grounds that the plaintiff had assumed the risk and that a master was not liable for injuries caused by the negligence of a fellow servant. *Id.* at 520. This court rejected both arguments, drawing on common-law rules that had developed in other jurisdictions:

"It is the duty which the master owes to every servant to provide a reasonably safe place in which to work, and although he is not an insurer he is bound on the same principle by the law to exercise due and proper care in this regard, as he is in hiring competent servants, or in supplying reasonably safe machinery or other instrumentalities for the use of his servants.

"This is regarded as a personal or absolute obligation. And if the discharge of this obligation is intrusted to a servant, such servant is the representative of the master, and any negligence on his part is the negligence of the master.

"The servant has a right to rely on the master's performance of this duty, and his omission to take due care in this respect, whereby injury results to his servant, will be included among the risks he assumes, and for which he is liable; and while he is not an insurer of their safety, he is not at liberty to neglect all care; he must use due and reasonable care, according to the exigencies of the undertaking. The obligation not to expose the servant to perils which by proper diligence may be guarded against becomes more important, and the degree of diligence and care to be exercised in its performance the greater in proportion to the dangers which may be encountered."

*Id.* at 528. This court held that an employer, and the employer's representatives, have a duty "to use reasonable care and diligence and [to] make reasonable provision for the servant's safety," and that failure to do so subjected the employer to liability. *Id.* at 532.

Although *Anderson* was decided some 30 years after the drafters wrote the Oregon Constitution, nothing in the court's opinion in that case suggested that the holding was novel or that the decision marked a departure from any previous decisions or jurisprudence on the subject. We conclude that, in 1857, the common law of Oregon would have recognized that a worker had a cause of action for negligence against his employer for failing to provide a safe workplace and failing to warn of the dangerous conditions to which the worker would be exposed at work.

The next question is whether there is a remedial process available to plaintiff for seeking redress for the injuries that he alleges that he suffered to his lungs and other

parts of his body when he was exposed to acid mist and fumes at work. As we have explained, when the drafters wrote the Oregon Constitution, plaintiff would have had a negligence cause of action against his employer for his alleged injuries. However, in 1913, the Oregon Legislature adopted the "Workmen's Compensation Act," which subsequently was referred to the people by petition under Article IV, section 1, of the Oregon Constitution. *See Salem Hospital v. Olcott*, 67 Or 448, 449-50, 136 P 341 (1913) (explaining adoption of Workmen's Compensation Act). Section 12 of the act provided, in part:

> "Every workman subject to this Act * * * who, * * * while so employed sustains personal injury by accident arising out of and in the course of his employment and resulting in his disability * * * shall be entitled to receive from the Industrial Accident Fund hereby created the sum or sums hereinafter specified and the right to receive such sum or sums shall be in lieu of all claims against his employer on account of such injury or death except as hereinafter specifically provided * * *."

Or Laws 1913, ch 112, § 12. Many years later, this court explained that the workers' compensation system had been adopted "to require industry to carry the burden of personal injuries sustained by its employees in their work," *Newell v. Taylor*, 212 Or 522, 527, 321 P2d 294 (1958), and that it was so well established that no citation was required for the proposition "that the act is remedial in character and should be liberally construed to promote the beneficial results intended." *Id.* at 527-28.

Earlier, this court had observed that the twofold purposes of workers' compensation statutes were to afford protection to workers in the form of compensation for work-related injuries and to protect employers from expensive litigation. *See Bigby v. Pelican Bay Lbr. Co.*, 173 Or 682, 692, 147 P2d 199 (1944) (so stating). The Workmen's Compensation Act achieved those purposes by providing compensation to injured workers in lieu of the common-law remedy, and by making workers' compensation the exclusive remedy for work-related injuries, unless provided otherwise by statute. *Atkinson*, 190 Or at 13. In keeping with the purposes of the act, this court long has held that an award of compensation is

the full and complete measure of a worker's recovery for work-related injuries, including all consequences of the injury, such as aggravation. *See Kowcun v. Bybee*, 182 Or 271, 295, 186 P2d 790 (1947) (so stating).

When the workers' compensation program was adopted, and for almost 70 years thereafter, the statutory scheme provided that a work-related injury was a "compensable injury" if the worker could show, as a plaintiff had been required to show at common law, that the work-related incident was a contributing cause of the injury. *See Kehoe v. Ind. Accident Com.*, 214 Or 629, 637, 332 P2d 91 (1958) ("[T]he law does not weigh the relative importance of the several causes that bring about the injury—it is sufficient if the accident occurring through employment is a contributing cause of the result."). Moreover, this court held that the word "injury" in the workers' compensation statutes was to be given "broad and liberal construction in view of the remedial and humanitarian purposes of the [Workers'] Compensation Law." *Kinney*, 245 Or at 549.

■ Under current workers' compensation law, an occupational disease generally is considered to be an injury. ORS 656.804. However, as we have explained, workers' compensation law now provides that occupational diseases and some injuries are "compensable" injuries only if the worker can prove that the work-related incident was the major contributing cause of the disease or injury. *See* ORS 656.802(2)(a); ORS 656.005(7)(a) (identifying circumstances in which "major contributing cause" standard applies).[22] The major contributing cause standard means a cause, or combination of causes, that contributes more to the injury for which the worker seeks compensation than all other causes combined, or most of the cause. *See McGarrah v. SAIF*, 296 Or 145, 166,

---

[22] This court first used the "major contributing cause" standard for establishing the compensability of occupational disease claims in *Dethlefs v. Hyster Co.*, 295 Or 298, 310, 667 P2d 487 (1983). The Court of Appeals previously had done so in *SAIF v. Gygi*, 55 Or App 570, 574, 639 P2d 665 (1982). Thereafter, the legislature codified the "major contributing cause" standard in ORS 656.802(2)(a) and ORS 656.005(7)(a). Or Laws 1990, ch 2, §§ 3, 43 (Spec Sess). Thus, to the extent that the exclusive remedy provisions of ORS 656.018 (1995) are infirm constitutionally in situations in which the worker must meet the "major contributing cause" standard of proof for a claim to be compensable, we acknowledge the appellate courts' inadvertent contribution to the problem that we now are addressing in this case.

675 P2d 159 (1983) (if at-work conditions, compared to nonemployment exposure, are major contributing cause of disease or disorder, then claimant eligible for compensation). The major contributing cause standard did not exist at common law. Thus, for those workers' compensation claims that are subject to the major contributing cause standard, workers' compensation law does not provide compensation for a work-related incident that was only a contributing cause of the workers's injury. Therefore, workers' compensation law no longer provides a remedy for some wrongs or harms occurring in the workplace for which a common-law negligence cause of action had existed when the drafters wrote the Oregon Constitution in 1857. Nevertheless, under ORS 656.018 (1995), workers' compensation law purports to be the exclusive remedy for work-related injuries, whether or not a claim is compensable.

In *Errand*, this court examined the legislature's intent when it enacted the "exclusive remedy" provisions of ORS 656.018 (1993). The court concluded that the legislature had not intended to prevent a worker whose workers' compensation claim had been denied for failure to meet the major contributing cause standard from pursuing civil negligence claims against the employer in the effort to receive at least some damages for work-related injuries. *Errand*, 320 Or at 525. Because this court decided *Errand* based on its analysis of the legislature's intent when it enacted ORS 656.018 (1993), the court did not reach the argument that the exclusive remedy provisions of the statute violated the remedy clause. *See id.* at 525 n 6 (so stating).

As we have explained, in response to *Errand*, the 1995 Legislature amended ORS 656.018 to make workers' compensation the "exclusive remedy" for work-related injuries, whether or not a claim is compensable. That is, the legislature made clear that, in enacting the 1995 amendments, it *did* intend what this court had assumed it had *not* intended in *Errand*. The question of the constitutionality of the exclusive remedy provisions in ORS 656.018 that the court was not required to address in *Errand* therefore is presented squarely in this case.

■ Based on our analysis of the remedy clause of Article I, section 10, we conclude that determining whether the exclusive remedy provisions of ORS 656.018 (1995) violate that clause involves a case-by-case analysis. The first inquiry is whether a workers' compensation claim alleges an injury to an "absolute" common-law right that the remedy clause protects. If it does, and the claim is accepted and the worker receives the benefits provided by the workers' compensation statutes, then the worker cannot complain that he or she has been deprived of a remedial process for seeking redress for injury to a right that the remedy clause protects. Neither can the worker complain that he or she has been deprived of a remedial process if a compensation claim is denied because the worker is unable to prove that the work-related incident was a contributing cause of the alleged injury, which is what a plaintiff would have had to prove in a common-law cause of action for negligence. However, if a workers' compensation claim for an alleged injury to a right that is protected by the remedy clause is denied because the worker has failed to prove that the work-related incident was the major, rather than merely a contributing, cause of the injury, then the exclusive remedy provisions of ORS 656.018 (1995) are unconstitutional under the remedy clause, because they leave the worker with no process through which to seek redress for an injury for which a cause of action existed at common law.

In this case, as noted, plaintiff alleges that he suffered injuries to his lungs and other ailments when he was exposed to sulfuric, hydrochloric, and hydrofluoric acid mist and fumes at work. As we have explained, for those injuries, he would have had a common-law cause of action when the drafters wrote the Oregon Constitution in 1857. However, plaintiff followed the procedures prescribed by Oregon statutes and first filed a workers' compensation claim. The ALJ held that plaintiff had not suffered a compensable injury because, although the work exposure might have contributed to his injuries, plaintiff could not prove that the work exposure was the major contributing cause of his injuries.

As we have explained, plaintiff believed that he had suffered *an* injury at work, albeit not a *compensable* injury as defined under present workers' compensation law. Therefore,

after his workers' compensation claim was denied, plaintiff filed this action to seek redress for his injuries. For the reasons that we have explained, the remedy clause mandates that a remedy be available to all persons—including workers—for injuries to "absolute" common-law rights for which a cause of action existed when the drafters wrote the Oregon Constitution in 1857. Having alleged an injury of the kind that the remedy clause protects, and having demonstrated that there was no remedial process available under present workers' compensation laws, plaintiff should have been allowed to proceed with his negligence action. The Court of Appeals erred in affirming the trial court's dismissal of plaintiff's complaint on the ground that the exclusive remedy provisions of ORS 656.018 (1995) barred his claim.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to that court for further proceedings.