Argued and submitted March 18, 2009, affirmed in part; reversed in part; and remanded February 10, 2010

Kenneth ACKERMAN,
*Plaintiff-Respondent,*

*v.*

OHSU MEDICAL GROUP,
George West,
and Oregon Health and Science University,
*Defendants-Appellants,*

*and*

Jonathan CARLSON,
*Defendant.*

Multnomah County Circuit Court
040808851; A134282

227 P3d 744

William F. Gary argued the cause for appellants. With him on the briefs were Sharon A. Rudnick, Susan D. Marmaduke, and Harrang Long Gary Rudnick P.C.

Patrick L. Block argued the cause for respondent. With him on the brief were Richard M. Rogers, and Kathryn H. Clarke.

Before Schuman, Presiding Judge, and Rosenblum, Judge, and Sercombe, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Plaintiff was injured as the result of treatment he received while a patient at Oregon Health and Science University (OHSU). He brought this action against two of his physicians as well as OHSU and OHSU Medical Group (Medical Group), the latter two in their capacity as the physicians' employers. A jury returned a verdict in favor of one of the physicians, but found that the other, West, was negligent, that his negligence resulted in injury to plaintiff, and that the injury caused plaintiff $1,412,000 in damages. In post-verdict proceedings, the court concluded that, pursuant to provisions of the Oregon Tort Claims Act (OTCA) (set out below) that limit the liability of public bodies and their employees, OHSU's liability was limited to $200,000. That limitation, the court held, did not violate Article I, section 10, of the Oregon Constitution, a provision that guarantees to every person a "remedy by due course of law" for an "injury done him in his person." The court also concluded that, although the same statutes had the effect of limiting Medical Group's and West's liability, application of the statutes in favor of those defendants *did* deprive plaintiff of an adequate remedy and therefore violated Article I, section 10. Consequently, the court entered judgment in favor of plaintiff in the amount of $1,412,000 and specified that OHSU was liable for $200,000 of that amount.

The parties agree that the court properly limited OHSU's liability to $200,000. *See Clarke v. OHSU*, 343 Or 581, 600, 175 P3d 418 (2007) (OHSU is subject to the OTCA damages cap, and application of that cap to OHSU does not violate Article I, section 10). At issue on appeal is the remaining $1,212,000. Defendants argue that the court erred in refusing to dismiss Medical Group from the case entirely or, in the alternative, in not limiting Medical Group's liability to $200,000 under the same rationale that applied to OHSU. With respect to West, defendants contend that, pursuant to the OTCA, his liability should have been shifted to OHSU and subsumed into OHSU's $200,000 liability, notwithstanding Article I, section 10. We agree with defendants that Medical Group's liability should have been limited to $200,000. However, we agree with plaintiff that applying the

OTCA to West would violate Article I, section 10. We therefore affirm in part, reverse in part, and remand.

## I. FACTUAL, PROCEDURAL, AND LEGAL BACKGROUND

The relevant facts are few and, at this stage of the litigation, undisputed. Plaintiff entered the OHSU hospital for surgery to repair a disc injury in his neck. He was treated by West, among others. West was an employee of both OHSU and Medical Group, which is a nonprofit corporation whose membership consists of one institution (OHSU) and several individuals (all of whom are OHSU faculty). After the surgery, complications ensued, and plaintiff brought this action. A jury found that West's treatment was negligent and returned a verdict in plaintiff's favor for $412,000 in economic damages and $1,000,000 in noneconomic damages. As they had on several occasions before and during the trial, defendants moved after the verdict to dismiss West and Medical Group from the case, substitute OHSU in their place, and limit OHSU's liability to $200,000, pursuant to provisions of the OTCA. The court denied the motions, ruling that application of the OTCA provisions to Medical Group and West deprived plaintiff of a constitutionally guaranteed remedy. The court then entered judgment in favor of plaintiff for the full amount of his damages, specifying that OHSU was responsible for only $200,000. Defendants appeal.

This case, then, involves two provisions of the OTCA and how they interact with Article I, section 10, of the Oregon Constitution.[1] The two OTCA provisions are ORS 30.265(1) and *former* ORS 30.270(1) (2007), *repealed by* Or Laws 2009, ch 67, § 20.[2] ORS 30.265(1), sometimes called the "substitution statute," provides, in part:

"[E]very public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties. * * * The sole cause of action for any tort of officers, employees or agents of a

---

[1] Plaintiff also raises claims involving Article I, section 17, of the Oregon Constitution, which guarantees the right to trial by jury. We do not reach those claims, for the reasons set out in this opinion.

[2] All subsequent references to ORS 30.270 are to the 2007 statute.

public body acting within the scope of their employment or duties * * * shall be an action against the public body only. The remedy provided by ORS 30.260 to 30.300 is exclusive of any other action or suit against any such officer, employee or agent of a public body whose act or omission within the scope of the officer's, employee's or agent's employment or duties gives rise to the action or suit. No other form of civil action or suit shall be permitted. *If an action or suit is filed against an officer, employee or agent of a public body, on appropriate motion the public body shall be substituted as the only defendant.*"

(Emphasis added.) In turn, ORS 30.270(1) limits the damages that a plaintiff can recover against a "public body" to:

"(a)   $50,000 to any claimant for any number of claims for damage to or destruction of property, including consequential damages, arising out of a single accident or occurrence.

"(b)   $100,000 to any claimant as general and special damages for all other claims arising out of a single accident or occurrence unless those damages exceed $100,000, in which case the claimant may recover additional special damages, but in no event shall the total award of special damages exceed $100,000.

"(c)   $500,000 for any number of claims arising out of a single accident or occurrence."

Thus, in the typical case against a public employee for negligence in the scope of his or her employment, the employee will be dismissed from the case, the public employer will be substituted as the defendant, and the plaintiff's damages will be subject to the OTCA caps. According to defendants, that (more or less) is what should occur here: West and Medical Group should be dismissed, leaving OHSU as the only liable party, with its liability limited to $200,000: $100,000 in "general" damages and $100,000 in "special" damages.[3]

---

[3] "General damages * * * now are described as noneconomic damages and encompass nonmonetary losses, including damages for pain and suffering * * *. Special damages now are described as economic damages and refer to the verifiable out-of-pocket losses, including medical expenses, loss of income and future impairment of earning capacity[.]" *Clarke*, 343 Or at 608 n 17.

The Remedy Clause of Article I, section 10, however, guarantees that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." That clause and the substitution statutes are obviously in some tension with each other. When a public body's officer, agent, or employee negligently injures a person and the injury is quantified at an amount larger than the OTCA cap, the injured person has arguably suffered an injury for which the state has deprived him or her of a full remedy. In two cases, the Supreme Court has established an analytical framework for mediating this tension, both generally and in the context of a medical malpractice claim against an OHSU physician.

In *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 124, 23 P3d 333 (2001), the Supreme Court set out the general framework for determining whether a legislative enactment violates the Remedy Clause:

"[I]n analyzing a claim under the remedy clause, the first question is whether the plaintiff has alleged an injury to one of the absolute rights that Article I, section 10 protects. Stated differently, when the drafters wrote the Oregon Constitution in 1857, did the common law of Oregon recognize a cause of action for the alleged injury? If the answer to that question is yes, and if the legislature has abolished the common-law cause of action for injury to rights that are protected by the remedy clause, then the second question is whether it has provided a constitutionally adequate substitute remedy for the common-law cause of action for that injury."

In *Clarke*, the court applied the *Smothers* analysis to a medical malpractice claim against OHSU and several of its individual medical employees. The plaintiff had incurred (or would incur in the future) more than $17,000,000 in damages due to malpractice by one or more of those employees.[4] The defendants successfully moved to substitute OHSU as the sole defendant, conceded negligence, conceded damages in excess of the $200,000 OTCA cap, and then successfully moved to have the court enter judgment against OHSU for

---

[4] Because the trial court granted the defendant's motion for a judgment on the pleadings, ORCP 21 B, the Supreme Court assumed the pleaded facts to be true. *Clarke*, 343 Or at 586. We recite the facts as did the Supreme Court.

$200,000. *Clarke*, 343 Or at 586-87. The Supreme Court, presuming that the plaintiff's injuries were to an "absolute right," held that OHSU was an instrumentality of the state performing state functions and, as such, would have been immune from liability in 1857 under the common-law doctrine of sovereign immunity; the plaintiff, therefore, would not have had a common-law remedy for his injury, and, for that reason, the substitution statute did not deprive him of a protected right. Indeed, the court concluded, the legislature could have immunized OHSU completely, thus providing plaintiff with no remedy at all. *Id.* at 610.

Regarding the legislature's limitation of the individual employees' liability, however, the court concluded that, because the employees would *not* have qualified for sovereign immunity at common law, the plaintiff's remedy against them *would* have existed at common law and was therefore *within* the protection afforded by the Remedy Clause. In *Smothers* terms, the court answered the first inquiry by ruling that "the common law of Oregon recognize[d] a cause of action for the alleged injury." 332 Or at 124. Regarding the second *Smothers* inquiry, the court held that, although the legislature had the authority notwithstanding the Remedy Clause to "vary or modify the * * * amount of recovery for a common-law remedy," that authority was not unlimited. *Clarke*, 343 Or at 609. Rather, because the remedy was constitutionally protected, the legislature had to leave in place an adequate substitute for it. *Id.* at 610. As applied to the plaintiff's claim against the individual defendants, the court concluded that the "substitute and cap" provisions of the OTCA violated the Remedy Clause because the substitute remedy—$200,000—"is an emasculated version of the remedy that was available at common law." *Id.*

## II. DISCUSSION

Against the foregoing background, this case presents several interrelated questions. The first ones address the liability of Medical Group: Did the court err, as defendants allege, by not dismissing Medical Group from the case? If not, did the court err (as defendants argue in the alternative) in concluding that limiting Medical Group's liability to $200,000 under the OTCA violated the Remedy Clause?

Regarding West, there is no dispute that, if it were not for the Remedy Clause, he would have qualified for dismissal under the OTCA. The only inquiry, therefore, is whether applying the OTCA to West violates plaintiff's rights under Article I, section 10, by denying plaintiff a constitutionally adequate remedy.

### A. *Plaintiff's remedy against Medical Group*

#### 1. *Should Medical Group have been dismissed from the case?*

Defendants advance two closely related arguments in support of their position that Medical Group should have been dismissed from the case. First, they argue that, independent of any requirement to substitute OHSU for Medical Group, Medical Group should have been dismissed outright. Defendants rely on the following sentence in ORS 30.265(1): "The sole cause of action for any tort of officers, employees or agents of a public body acting within the scope of their employment or duties * * * shall be an action against the public body only." It follows, defendants argue, that, because West was an employee of OHSU, plaintiff's "sole cause of action" was against that public body. However, the trial court found, and defendants do not contest, that West was also employed by Medical Group. Defendants' argument therefore is that, under ORS 30.265(1), if a plaintiff is injured by a person in the scope of that person's duties as an employee of more than one public body, then the plaintiff will have a remedy against only one defendant.[5]

■ The plain language of ORS 30.265(1), however, cannot support such an interpretation. The lead sentence of the statute declares that "*every* public body is subject to action or

---

[5] At trial, plaintiff argued that Medical Group is not a public body and is therefore unable to invoke the liability limits of the OTCA. The trial court ruled against him. *See* ORS 353.117(2)(c) (OHSU may create an entity "for the purpose of conducting clinical care and practice and advancing other university missions by the faculty, ORS 353.117(1)"; such an entity is a "public body for purposes of" the OTCA); *see also* ORS 30.260(4)(b) ("public body" in the OTCA includes an instrumentality of a public corporation). Although plaintiff's brief on appeal expresses disagreement with that ruling, he does not present any argument against it or cross-assign it as error.

As explained more fully below, the fact that the legislature has declared that entities such as Medical Group are now "public bodies" for purposes of the OTCA does not mean that those entities would necessarily have been "instrumentalities of the state" in 1857 for purposes of sovereign immunity and analysis under the Remedy Clause.

suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties." (Emphasis added.) The remainder of the subsection amplifies and explains that lead sentence. Thus, the subsequent statement that an injured person's "sole cause of action" for the torts of an officer, employee, or agent of *"a"* public body is against *"the"* public body does not mean that a plaintiff has only one cause of action; it means that (each and) every public body is substituted for that public body's employee. (Emphasis added.) That interpretation is strengthened by the legislative history of ORS 30.265(1), as related in *Jensen v. Whitlow*, 334 Or 412, 416-17, 51 P3d 599 (2002): the purpose of the "substitute and cap" statutes was to "eliminate any claim against any officer, employee, or agent for their [*sic*] work-related torts," not to limit a plaintiff's claims to a single public employer; such a limitation would have no positive effect on the public employee's personal immunity. We conclude that the import of the sentence, "The sole cause of action for any tort of officers, employees or agents of a public body * * * shall be an action against the public body only," is not that a tort plaintiff can bring an action against only one public employer per injury, but that the public employee's liability is shifted to his or her public employer or public employers, subject to the $500,000 maximum recoverable as the result "of a single accident or occurrence." ORS 30.270(1)(c).

Defendants' second argument in support of their theory that the court should have dismissed Medical Group depends on the premise that Medical Group is itself an agent of OHSU. Therefore, defendants conclude, ORS 30.265(1) should have been applied so as to dismiss Medical Group and shift its liability to OHSU. While defendants' first theory focuses on Medical Group as a coemployer of West who should have been dismissed because plaintiff could sue only one of West's employers, the second theory focuses on Medical Group as OHSU's agent and appears to rest on the premise that plaintiff had a cause of action against both West and Medical Group as OHSU agents, and OHSU should therefore have been substituted for both.

Defendants' argument that Medical Group is an agent of OHSU cannot prevail in light of *Vaughn v. First Transit, Inc.*, 346 Or 128, 206 P3d 181 (2009). The plaintiff in

*Vaughn* was allegedly injured when the driver of a shuttle bus operated by First Transit swerved and the plaintiff, a passenger, was thrown against a metal luggage rack. *Id.* at 133. First Transit operated under an agreement with the Port of Portland, a public body. *Id.* at 131. When the plaintiff brought an action against the driver and First Transit, First Transit invoked ORS 30.265(1) in a motion to dismiss, arguing that, because it was an agent of the Port, that public body had to be substituted as the sole viable defendant. *Id.* In a careful analysis of the term "agent" as it is used in the OTCA, the court held that the term applied only to those agents that, at common law, would be regarded as "nonemployee agents," defined, in turn, as agents subject to the control of their principal with respect to the "physical details" of their conduct:

> "[P]rincipals ordinarily are vicariously liable for the torts of their nonemployee agents only when the principal had the right to control the physical details of the conduct of the agent that gave rise to the tort claim. In our view, when the legislature made public bodies vicariously liable for the torts of their 'agents' through the OTCA, it intended to impose that same vicarious liability on public bodies for the torts of their nonemployee agents[.]"

*Id.* at 140. Thus, the Port would have an agency relationship with First Transit justifying use of the substitution statute only if the defendants could "show that the Port had the right to control the physical details of the manner of performance of the conduct giving rise to the tort—[the driver's] driving." *Id.* at 141. The court then examined the contract between First Transit and the Port and concluded that the necessary agency relationship did not exist. *Id.* at 142.

To support their motion for summary judgment dismissing Medical Group, defendants submitted (among other things) the declaration of Magnusson, OHSU's "Chief Medical Officer." As relevant to the agency relationship, Magnusson declared, "OHSU carries out ongoing monitoring of the delivery of patient care services within the OHSU health system, including all day-to-day patient care services and the quality of such services[.]" The court denied defendants' motion, ruling that the evidence did not establish the necessary agency relationship as a matter of law. We agree. The allegation that OHSU monitored day-to-day patient care

services of Medical Group members, presumably including West, does not, without more, establish that OHSU controlled the physical details of the manner in which West performed patient care by, for example, requiring specific medications or compelling the use of one rather than another surgical protocol. To establish that level of control, defendants needed to adduce more evidence at trial. As they concede, they did not do so.[6] The court therefore did not err in refusing to dismiss Medical Group.

　　2.　*Would Medical Group have been immune from liability to plaintiff at common law in 1857, and, for that reason, is it entitled to invoke the OTCA without violating the Remedy Clause?*

Defendants argue that, even if Medical Group should not have been dismissed because plaintiff could sue only one employer, nor because Medical Group was itself an agent of OHSU, nonetheless it, like OHSU, was a public body employer of West and therefore entitled to the OTCA $200,000 limit on liability, the Remedy Clause notwithstanding; the Remedy Clause does not guarantee plaintiff a full recovery from Medical Group, defendants contend, because, as *Smothers* and *Clarke* explain, that guarantee protects only those causes of action that a plaintiff would have had in 1857. According to defendants, plaintiff would have had no cause of action against Medical Group in 1857, for three independent reasons: Medical Group, like OHSU, would have had sovereign immunity as an instrumentality of the state; would have had charitable immunity; and would have had immunity because, at common law, employers of physicians did not have *respondeat superior* liability. We begin with sovereign immunity, because our determination of that inquiry obviates the need to examine the others.

■■　　The legislature has declared that entities such as Medical Group are "public bodies" for purposes of the OTCA. ORS 353.117; ORS 30.260(4)(c).[7] They are therefore entitled to claim the protection of the "substitute and cap" provisions

---

[6] Defendants, responding to plaintiff's assertion that the denial of their motion for summary judgment is not reviewable, assert that their argument on appeal concerning dismissal of OHSU Medical Group is a purely legal issue. We agree.

[7] *See* 233 Or App at 518 n 5.

of that Act. However, whether applying those statutes so as to limit Medical Group's liability would deprive plaintiff of a constitutionally protected remedy depends, in the first instance, on whether Medical Group is an "instrumentality of the state," which is not the same thing as a "public body." Whether Medical Group is an instrumentality of the state, and therefore entitled to sovereign immunity, is not a matter that can be determined by legislative declaration. If it were, the legislature could circumvent the Remedy Clause by simply declaring that, for example, all individuals and corporations are "public bodies." As the Supreme Court noted in a similar context, "The analysis is somewhat more complex than that." *Hale v. Port of Portland*, 308 Or 508, 517, 783 P2d 506 (1989), *abrogated on other grounds by Smothers*, 332 Or 83, 23 P3d 333 (2001).

The common-law rule of sovereign immunity, incorporated into Oregon law at statehood, is "implicit" in the constitution. *Cole v. Dept. of Rev.*, 294 Or 188, 191, 655 P2d 171 (1982); *see also Hale*, 308 Or at 514-15, 518. Article IV, section 24, of the Oregon Constitution establishes and defines an exception to that rule: "Provision may be made by general law, for bringing suit against the State[.]" Thus, what is or is not encompassed by the term "state" in section 24, and therefore the contours of permissible legislative grants of sovereign immunity, is a matter of constitutional interpretation for the court. *See, e.g., Clarke*, 343 Or at 594 ("[T]his court interprets the doctrine of sovereign immunity * * *.").

In *Clarke*, the Supreme Court was called on to determine whether OHSU was a state instrumentality and therefore entitled to sovereign immunity. In concluding that it was so entitled, the court reviewed existing case law and identified three

"attributes generally possessed by instrumentalities of the state. [1] An instrumentality of the state performs a function traditionally performed by the state. [2] Additionally, the state generally outlines the powers and duties of its instrumentalities, either via statutory enactment or some other method. [3] An instrumentality of the state is subject, at least in part, to the control of the state in some way."

343 Or at 596. We must therefore determine whether Medical Group possesses these attributes.

OHSU Medical Group was incorporated in 1998 as an Oregon nonprofit corporation. Its articles of incorporation and bylaws refer to it as "a public benefit corporation" and specify that its purpose is "supporting the mission and purposes of [OHSU]." The articles and bylaws also establish two classes of members: a single "university member," which is OHSU, and "faculty members," who are selected current members of the OHSU faculty. Although all members are entitled to vote in the conduct of the organization's business, no matter can be approved unless both a majority of faculty members and the OHSU member vote for it, thereby giving OHSU direct veto power and, at least theoretically, indirect power affirmatively to dictate policy (theoretically, because, in some sense, the power to hire and fire is the power to control). The Board of Directors consists of 30 persons appointed by OHSU, 17 faculty members, and 12 independent directors who are neither OHSU nor faculty. Thus, OHSU directly controls a majority of the Board.

When Medical Group was incorporated in 1998, no statute expressly authorized OHSU to create such an entity. Rather, as Medical Group's articles of incorporation state, it was created "under the Oregon Nonprofit Corporation Law," ORS ch 65. The statutes governing OHSU, however, stated that its mission included "[t]he delivery of health care to contribute to the development and dissemination of new knowledge," ORS 353.030(1)(b)(C), and "the provision of inpatient and outpatient clinical care and health care delivery systems throughout the state," ORS 353.030(3)(c). The statutes also authorized OHSU to "create, * * * establish, and operate, * * * any * * * health care facility or other unit of operation," as well as to "[p]erform any other acts that in the judgment of the board or university are requisite, necessary or appropriate in accomplishing the purposes described in or carrying out the powers granted by this chapter." ORS 353.050(12), (25). Three years after Medical Group was incorporated, the legislature enacted ORS 353.117:

"(1) Pursuant to ORS 353.050, Oregon Health and Science University may create and maintain an entity that

is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, as amended, for the purpose of conducting clinical care and practice and advancing other university missions by the faculty."

As explained in the employment agreement between West and Medical Group, faculty members of Medical Group deliver health care services to patients. Each faculty member provides "teaching, research, and administrative services to OHSU, for which they are typically employed by and compensated by OHSU. Faculty members also provide Clinical Services to patients, [in facilities rented from OHSU,] for which they are typically employed by and compensated by the Medical Group." Medical Group collects fees that are paid to faculty members; a portion of these "clinical revenues" is then paid over to OHSU "in part to fund the mission, purposes, and activities of OHSU, including, among other things, payment of Faculty Member compensation by OHSU." Although each faculty member receives compensation from OHSU and separate compensation from Medical Group,

"OHSU and Medical Group have agreed that OHSU will act as a common paymaster for compensation payable to Faculty Members. * * * In simple terms, it means that Faculty Members will receive 'two checks,' but that for federal tax withholding purposes, Faculty Members will be treated as having one employer rather than two."

Based on the foregoing facts and the teaching of *Clarke*, we conclude that Medical Group is an "instrumentality of the state" and that, therefore, it would have been immune in 1857.

a.  Traditional state function

The Supreme Court held in *Clarke*, 343 Or at 599, that OHSU's function, a "combination of education and health care in the form of a research and teaching hospital," is traditionally performed by the state. As noted, Medical Group's sole charge as outlined in its bylaws and articles of incorporation is to support that mission. Necessarily, then, Medical Group's function is subordinated to and subsumed in OHSU's, and it is therefore also a traditional state function.

b.    State control

Further, Medical Group "is subject, *at least in part*, to the control of the state *in some way.*" *Id.* at 596 (emphasis added). OHSU, itself an instrumentality of the state, has direct veto power over proposed actions that are submitted to a vote of the Medical Group membership, and, because it can hire and fire faculty, it has indirect affirmative power as well. OHSU also controls the majority of Medical Group's board of directors who, in turn, select Medical Group's Medical Director and Chief Executive Officer, and OHSU "monitors" the day-to-day provision of patient care by physician members of Medical Group. Thus, "in some way"—albeit tenuously and indirectly—OHSU (and therefore the state) exerts "at least in part" some control over Medical Group.

c.    State outline of powers and duties

Defendants argue that ORS 353.117 directly "outlines [Medical Group's] * * * powers and duties." *Clarke*, 343 Or at 596. That statute, however, was enacted three years after Medical Group's creation and merely authorizes OHSU to "create and maintain" a tax-exempt entity "for the purpose of conducting clinical care and practice and advancing other university missions by the faculty." It does not, in any way, outline Medical Group's "powers and duties." In fact, no statute or administrative rule directly sets out the powers and duties of Medical Group to the same extent that ORS chapter 353 prescribes the powers and duties of OHSU. *See Clarke*, 343 Or at 598-99 (describing OHSU's statutory framework). Rather, Medical Group's powers and duties are set out in its bylaws.

However, the bylaws themselves are produced by OHSU (and hence the state) in the sense that, because OHSU controls Medical Group's board and membership, it controls their work product. More significantly, Medical Group's bylaws expressly state that the entity "has been organized under the authority of [ORS] 353.050 * * * to support the mission and purposes of [OHSU]," and there is no evidence in the record that it does anything else. OHSU's powers and duties are spelled out in detail by statute. *Clarke* teaches that the state generally outlines the powers and

duties of its instrumentalities, "either via statutory enactment or *some other method.*" 343 Or at 596 (emphasis added). We therefore conclude that Medical Group's powers and duties are outlined by the state through "some other method": the state created OHSU and gave it powers and duties, OHSU created Medical Group pursuant to statute, and Medical Group adopted OHSU's powers and duties.

### d. Financial entanglements

Although *Clarke* does not mention financial entanglements with the state as a factor to be considered in determining whether an entity is a state instrumentality, we believe that, in the present case, the "single paymaster" arrangement and the fact that Medical Group uses some of its revenue to fund OHSU's traditional state mission, are relevant considerations.

■ We conclude that, under *Clarke*, to determine whether an entity is a state instrumentality requires a functional as opposed to a formal inquiry and that, functionally, Medical Group qualifies. That conclusion means that, because Medical Group would have been immune at common law in 1857, application of the OTCA so as to limit Medical Group's liability to plaintiff does not deprive plaintiff of anything that is protected by the Remedy Clause. The trial court erred in denying Medical Group's motion to limit its liability to $200,000 pursuant to ORS 30.265(1).[8]

### B. *Plaintiff's remedy against West*

West, as an employee of OHSU and Medical Group, clearly falls within the scope of the substitution and cap statutes. Further, it is undisputed that, at common law, plaintiff would have had an uncapped remedy against West in his individual capacity. Thus, the only question regarding plaintiff's action against West is whether applying the OTCA to him in this case violates the Remedy Clause. More precisely,

---

[8] Because we conclude that plaintiff would not have had a civil action against either OHSU or Medical Group under the common law, the OTCA's damages cap relative to those entities does not violate Article I, section 17, the guarantee of a jury trial in civil cases. *Clarke*, 343 Or at 600 n 9 (citing *Lakin v. Senco Products, Inc.*, 329 Or 62, 82, 987 P2d 463 (1999) (Article I, section 17, "guarantees a jury trial in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 * * *."))

in light of our conclusion that plaintiff's remedy against OHSU is limited to $200,000 and that his remedy against Medical Group is also limited to $200,000, does dismissing West from the case and substituting OHSU and Medical Group—which would leave plaintiff with a remedy of $400,000, despite the fact that he incurred $1,412,000 in damages—provide him with an adequate remedy under Article I, section 10?

C.   *Did plaintiff receive a constitutionally adequate remedy?*

■      In *Jensen*, 334 Or at 421, the court held that the substitute remedy provided by the OTCA—a cause of action against a public body for damages, subject to the statutory cap—was not facially inadequate; a statute is unconstitutional on its face only if it is "incapable of constitutional application in any circumstance," and there are circumstances in which the OTCA could be applied without depriving a plaintiff of anything—in particular, situations in which a plaintiff's damages were less than the cap. *Jensen*, then, left open the possibility that, in some circumstances, application of the OTCA could deprive a plaintiff of a constitutionally protected remedy. Those circumstances occurred in *Clarke*, where the court held that limiting the plaintiff's remedy against OHSU to $200,000 after dismissing the individual tortfeasors, when his actual damages were over $17,000,000, violated the Remedy Clause, because the substitute remedy was "an emasculated version of the remedy that was available at common law." *Clarke*, 343 Or at 610. Our task is to determine whether that same conclusion is compelled by the facts in this case.

In doing so, we must infer an outcome from general precepts that the court has articulated in other Remedy Clause cases adjudicating the adequacy of capped remedies as substitutes for common-law remedies, particular outcomes in those cases, and hints or inferences that we can glean from the court's Remedy Clause opinions and other material.

1.   *General precepts*

■■      In general, the Supreme Court "interprets the doctrine of sovereign immunity 'within the narrowest possible

bounds consistent with the constitutional provision.' " *Clarke*, 343 Or at 594 (quoting *State v. Shinkle*, 231 Or 528, 539, 373 P2d 674 (1962)). We also know that the adequacy of a legislatively created substitute remedy is gauged on a case-by-case basis. *Smothers*, 332 Or at 135. If that were not so, then the court could have dispensed with *Clarke* in a one-sentence per curiam opinion citing *Jensen*. As a corollary, we cannot gauge the constitutionality of a legislatively created damages cap wholesale, that is, by determining whether the legislature has compensated for abolishing or limiting an individual plaintiff's damages by expanding the availability of the limited remedy to additional plaintiffs. *See Clarke*, 343 Or at 601 (summarizing but not adopting the state's argument to that effect). The court in *Clarke* also rejected the defendants' contention that a substituted remedy is adequate so long as it is anything more than "the practical equivalent of no remedy at all." *Id.* At the other end of the spectrum, *Clarke* also rejected the plaintiff's theory that the legislature is obligated to provide a remedy that is "substantially equivalent" to the common-law remedy it is replacing. *Id.* (internal quotation marks omitted).

In addition, it is obvious that an important consideration is the discrepancy between the factfinder's uncapped verdict (here, $1,412,000), which presumably quantifies the severity and permanence of the injury that plaintiff had sustained, on the one hand and, on the other, the capped remedy (here, $400,000). *See id.* at 610. That consideration, in turn, encompasses three related but conceptually distinct factors: The amount of the capped award (here $400,000) and whether it is, in the Supreme Court's terms, "substantial," *Hale*, 308 Or at 523; *Greist v. Phillips*, 322 Or 281, 291, 906 P2d 789 (1995); *accord Neher v. Chartier*, 319 Or 417, 426, 879 P2d 156 (1994); the ratio between the two awards (here, the capped award is 28% of the jury's verdict, so the ratio is approximately 1 to 4); and the amount of the difference between the capped and uncapped awards (here, $1,000,000).

2. *Earlier Remedy Clause cases*

The court has actually ruled on the adequacy of capped remedies in only three cases. In *Greist*, a jury found that the plaintiff in a wrongful death action had incurred

$100,000 in economic damages and $1,500,000 in noneconomic damages. 322 Or at 286. Pursuant to ORS 18.560,[9] which capped the defendant's liability for noneconomic harm at $500,000, the plaintiff's capped recovery was $600,000 instead of $1,600,000. The court held that application of the statutory cap did not violate the Remedy Clause, because $600,000 was a "substantial" amount. *Id.* at 291. However, in *Clarke*, the court held that, for two reasons, *Greist* did not "support the individual defendants" in their argument that the OTCA cap was adequate: first, the plaintiff in that case was able to recover all of his out-of-pocket losses; second, "historically, recovery for wrongful death had been low." *Clarke*, 343 Or at 609. The court concluded,

> "In contrast, the legislation under review here does not merely adjust the recovery for a *legislatively created* remedial scheme; instead, it eliminates a *common-law* remedy against an individual tortfeasor."

*Id.* (emphasis added). The "legislation under review" in *Clarke*, of course, is the same legislation under review here. *Greist*, therefore, is of limited relevance in this case, where—as in *Clarke*—plaintiff was not able to recover all of his out-of-pocket losses and where the legislative scheme eliminates the common-law remedy against West for negligence.

*Hale* is also of little relevance. In that case, the plaintiff's capped remedy was $100,000, while his "medical bills alone reportedly exceed[ed] $600,000." 308 Or at 511. The court held that the limitation did not violate the Remedy Clause, again for two reasons: first, the substitute did not deprive the plaintiff of his entire remedy, and second, it compensated for reducing the remedy of some plaintiffs by providing a larger benefit to plaintiffs in general. *Id.* at 523-24. In discussing *Hale*, however, the court in *Clarke* distinguished it on the ground that "the court's analysis [in *Hale*] did not address the injured plaintiff's traditional right to seek full relief from an individual tortfeasor," whereas "[t]he statutory scheme at issue here [in *Clarke*], in contrast, eliminates any claim against an individual tortfeasor." *Clarke*, 343 Or at

---

[9] ORS 18.560 was subsequently held to be unconstitutional under Article I, section 17. *Lakin*, 329 Or at 82.

608-09. *Hale* is not helpful here, where "[t]he statutory scheme at issue" is the same as it was in *Clarke*.

The only case that the court in *Clarke* did not disavow for purposes of gauging the adequacy of substituted remedies was, of course, *Clarke* itself.

### 3. *Hints and inferences*

Thus, the general precepts do little to flesh out the governing adjectives—substantial, adequate, unemasculated—and the results of other cases dealing with caps provide little guidance. However, those cases (and other material) do contain reasoning from which we might draw inferences, albeit weak ones. Justice Balmer's concurring opinion in *Clarke*, joined by Justice Kistler, suggests that we might learn something about the "adequacy" of capped malpractice remedies from the amount of malpractice insurance that physicians typically carry—at least $1,000,000, and often as much as $5,000,000. As Justice Balmer explained,

> "The insurance obtained * * * by doctors for malpractice claims * * * does not necessarily determine the limits of liability that the legislature should set for purposes of the Oregon Tort Claims Act, let alone the level that is required by the Remedy Clause. At the very least, however, the decisions of private individuals and institutions regarding their insurance coverage provide some indication of the kinds of claims those private actors ordinarily face and, indirectly, of what kind of remedy for those claims likely would be 'substantial' or 'adequate' for purposes of the Remedy Clause."

343 Or at 612. Justices Balmer and Kistler urged the legislature to raise the cap in order to reflect more accurately a realistic social consensus about what kind of remedy for medical malpractice would be considered adequate. *Id.* And the legislature did so in 2009, raising the liability limit for actions against the state arising after December 28, 2007, to $1,500,000. We do not mean to suggest that either the concurrence in *Clarke* or the 2009 legislation bears directly on this case. A concurrence is just that and nothing more, and plaintiff's cause of action arose in 2003, before the new limits took effect. We mention the legislation and concurrence as relevant only insofar as they reflect what might reasonably

be considered "adequate" or "substantial." In that respect, they tend to support plaintiff's claim.

Defendant West counters that some statements by the court in *State v. Rodriguez/Buck*, 347 Or 46, 217 P3d 659 (2009), point in the opposite direction. In that case the defendant was convicted of sexual abuse, which called for a mandatory 75-month sentence under Measure 11 (1994). *Id.* at 49. The conduct for which the defendant was convicted consisted of "[bringing] the back of [the victim's] head into contact with her clothed breasts for about one minute." *Id.* The court held that the sentence, under the circumstances, violated the mandate of Article I, section 16, of the Oregon Constitution, that sentences be "proportioned to the offense." *Id.* at 79. In explaining its decision, the court wrote that cases such as *Rodriguez/Buck* and *Clarke* "illustrate the *specific, limited circumstances* in which we may conclude that a statute that is constitutional on its face nevertheless may be unconstitutional as applied to particular facts." *Id.* at 80 (emphasis added). According to defendant, that statement indicates that the court regards *Clarke* as an outlier, a rare exception to the general rule that the OTCA does not violate the Remedy Clause. In that respect, they argue, *Rodriguez/Buck* supports their position.

Thus, unfortunately, the inferences that we are invited to draw from the *Clarke* concurrence and *Rodriguez/Buck dicta* pull with equal force in opposite directions.

Although the general principles, specific case results, and indirect inferences leave us without a clear indication of how to resolve this dispute, we are nonetheless able to distill from them certain factors that appear to bear on the adequacy of a capped remedy. In descending order of importance, they are:

*The difference between what a plaintiff receives under the cap and what he or she would have received at common law.* This factor carries two glosses. First, although the ratio of the capped remedy to the uncapped remedy is significant, so too is the discrepancy between them. A plaintiff who incurs a $1,000,000 loss through application of a statutory cap suffers a $1,000,000 unremediated injury, regardless of how much he or she might otherwise have received, and it is

remediation for injury that Article I, section 10, protects. Indeed, the court's adjective of choice in describing remedies that are constitutionally inadequate is: "emasculated." *Clarke*, 343 Or at 606, 607, 610; *Smothers*, 332 Or at 119. That adjective, metaphorically, implies two qualities: quantitatively reduced and qualitatively weakened.[10] Both focus on that which is lost, as opposed to that which remains—a subtle but, we believe, significant nuance. Second, the amount that a plaintiff receives is the amount received from all defendants. An inadequate or nonexistent remedy with respect to one defendant can be offset at least partially by a remedy from another, while immunization of all defendants increases the likelihood of inadequacy. *Clarke*, 343 Or at 608-09; *Hale*, 308 Or at 519 (Linde, J., concurring).

*The amount of uncompensated out-of-pocket expenses a plaintiff endures by virtue of a capped remedy.* Although both economic and noneconomic losses were available at common law, the court appears to regard unremediated monetary expenses as a more serious deprivation than unremediated compensation for pain and suffering. *See Clarke*, 343 Or at 609 (distinguishing *Greist*).

*Whether the capped remedy supplants a common-law cause of action.* The court considers such caps to be more vulnerable to Remedy Clause attack than capped legislatively created causes of action such as wrongful death. *Id.*

*Whether the capped remedy is consistent with a narrow construction of sovereign immunity. Clarke*, 343 Or at 594; *Shinkle*, 231 Or at 539.

*The degree to which the capped remedy conforms to widespread social indicators regarding just compensation for injuries.* What the Supreme Court noted in an altogether different constitutional context applies here: when called upon in the process of constitutional interpretation to announce a

---

[10] The relevant literal definition of "emasculate" is "**1** : to deprive of virile or procreative power : CASTRATE, GELD **2** : to deprive of masculine vigor or spirit : weaken or attenuate by removal or alteration of potent qualities[.]" *Webster's Third New Int'l Dictionary* 738 (unabridged ed 2002). We recognize the anachronism of a term that seems to imply that strength and vitality are gender-specific, but the term is, at least for now, part of Article I, section 10, jurisprudence that we are powerless to excise.

value-laden standard, " 'the task of the law [is] to form and project, as well as mirror and reflect.' " *State v. Campbell*, 306 Or 157, 165, 759 P2d 1040 (1988) (quoting *United States v. White*, 401 US 745, 786, 91 S Ct 1122, 28 L Ed 2d 453 (1971) (Harlan, J., dissenting) (referring to judicial determination of "expectation of privacy")).

Applying those factors in the present case, we conclude that capping plaintiff's remedy at $400,000 violates Article I, section 10. The OTCA provisions that implement the cap leave him with approximately 28 percent of the $1,412,000 that the jury determined was necessary to make him whole. Applying the OTCA would cost him $1,000,000. Neither the ratio of the capped remedy to the jury-determined remedy, nor the raw numerical difference between them, can be said to "restor[e] the right that has been injured." *Smothers*, 332 Or at 120. Even focusing exclusively on plaintiff's economic damages, the OTCA cap shifts $12,000 of the burden for West's negligence to plaintiff, who, the parties agree, bears no blame. Further, the "substitute and cap" statutes abolish a common-law cause of action, not merely a legislatively created one; applying them to plaintiff requires an expansive interpretation of sovereign immunity; and their operation would leave plaintiff with a remedy that social indicators suggest is not "substantial" or "adequate." Thus, although the trial court erred in denying Medical Group's motion to limit its liability to $200,000, the court correctly ruled that plaintiff is entitled to an award of $1,412,000.[11] The proper judgment would find OHSU liable for $200,000; Medical Group liable for $200,000; and West liable for $1,012,000.

Affirmed in part; reversed in part; and remanded.

---

[11] Because we conclude that Article I, section 10, precludes application of the OTCA damages cap to plaintiff's claim against West, we need not decide whether Article I, section 17, the guarantee of a jury trial, has the same effect.